DAMIAN WILLIAMS
United States Attorney
Southern District of New York
By:  JACOB LILLYWHITE
Assistant United States Attorney
86 Chambers Street, Third Floor
New York, New York 10007
(212) 637-2639
jacob.lillywhite@usdoj.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA and the STATE OF NEW YORK *ex rel.* STEPHANIE MUNFORD, <br><br> Plaintiffs and Relator, <br><br> v. <br><br> MARANATHA HUMAN SERVICES, INC. and HENRY ALFONSO COLEY, <br><br> Defendants. | 18 Civ. 8892 (KMK) <br><br> **COMPLAINT-IN-INTERVENTION OF THE UNITED STATES OF AMERICA** |
| UNITED STATES OF AMERICA, <br><br> Plaintiff-Intervenor, <br><br> v. <br><br> MARANATHA HUMAN SERVICES, INC. and HENRY ALFONSO COLEY, <br><br> Defendants. | **JURY TRIAL DEMANDED** |

Plaintiff the United States of America (the "United States"), by and through its attorney,

Damian Williams, United States Attorney for the Southern District of New York, brings this

action against Maranatha Human Services, Inc. ("Maranatha") and Henry Alfonso Coley

("Coley") (collectively "Defendants") alleging as follows:

## PRELIMINARY STATEMENT

1.      This is a civil action brought by the Untied States against Maranatha and Coley

seeking treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729-33 (the

"FCA"), and, in the alternative, under the common law.   From 2010 through 2019, Defendants

knowingly submitted Consolidated Fiscal Reports ("CFRs") to the State of New York falsely

claiming millions of dollars that Defendants used to enrich Coley and his family and to support

for-profit ventures and pet projects as costs reasonable and necessary for the provision of

Medicaid-funded services.  As a result, Defendants received millions of dollars in Medicaid

funds to which they were not entitled based on the fraudulent reporting of these expenses.

2.      Maranatha is a non-profit organization that operates a number of Medicaid-funded

programs serving individuals with developmental disabilities in New York, including a

residential habilitation program and a day habilitation program.   Maranatha is required to submit

cost reports, called CFRs, to the State of New York each year, specifying the reasonable and

necessary costs that Maranatha incurred in providing services for its Medicaid-funded programs.

These costs are to be reported as "allowable" costs.  Maranatha is required separately to report its

other, "non-allowable" costs; "non-allowable" costs include costs unrelated to its Medicaid-

funded programs, as well as any unreasonable or unnecessary costs.

3.      The State of New York's Department of Health ("NYDOH") sets the rates at

which service providers like Maranatha are paid or reimbursed for these programs by Medicaid.

Two of Maranatha's programs, including its largest program, are reimbursed at provider-specific

rates set by NYDOH ("rate-based programs").  When setting provider-specific rates for these

rate-based programs, NYDOH relies on the "allowable" costs reported by the provider.

Typically, a provider that reports greater "allowable" costs in connection with a rate-based program will be granted a higher reimbursement rate for that program by NYDOH. NYDOH resets these rates periodically. In particular, NYDOH often adjusts for changes in operating expenses every two years.

4.      The vast majority of Maranatha's revenue comes from Medicaid.

5.      As alleged more fully below, since at least 2010, Coley and Maranatha falsely claimed millions of dollars in "allowable" costs, causing NYDOH to set higher reimbursement rates for Maranatha's rate-based programs. Defendants then billed Medicaid at these fraudulently inflated reimbursement rates and received millions of dollars in reimbursements to which they were not entitled.

6.      Defendants reported that these millions of dollars in expenses were reasonable and necessary for the provision of Medicaid-funded services, but they were not. Many of these costs were, in fact, expended for the benefit of for-profit companies and pet projects operated by Defendants that had nothing to do with Maranatha's Medicaid-funded services. During the relevant period, Coley formed a number of for-profit companies and—with the blessing of Maranatha's board—directed Maranatha to pay for expenses related to those ventures and ordered Maranatha employees to work on their behalf.

7.      Defendants' falsely reported "allowable" costs also included excessive salaries or consulting fees paid to Coley and his family, often in exchange for little or no work. These costs were not "allowable" because the payments were excessive in relation to the actual work performed and thus were neither reasonable nor necessary.

8.      Finally, Defendants' falsely reported costs included Coley's personal expenses, which by definition did not concern Maranatha's provision of Medicaid-funded services. These

personal costs included more than $34,000 spent on personal training sessions at a gym near

Coley's home, as well as holiday gifts and jewelry purchased by Coley.

9.      Defendants falsely reported all of these costs as "allowable" expenses, submitting

false cost reports each year from at least 2010 until 2019.  Each cost report contained multiple

false certifications signed by Coley attesting to the accuracy of the report.

10.     These false cost reports were material to NYDOH's decisions to grant Maranatha

higher reimbursement rates and pay subsequent claims by Maranatha at those higher rates.

Defendants' false cost reports caused NYDOH to set reimbursement rates for Maranatha's rate-

based programs at a level higher than the rates to which Maranatha was entitled and to pay

Maranatha's subsequent claims at those falsely inflated rates.

11.     When Maranatha billed Medicaid at these fraudulently inflated rates, Defendants

falsely certified in connection with each such claim that, among other things, they complied with

rules requiring that Maranatha submit truthful and accurate cost reports.

12.     Many of the "non-allowable" expenses were incurred with the knowledge and

approval of the Maranatha board, which was chaired by a long-time friend of Coley's.  In one

presentation to the board, Coley bragged that "[i]t was always the plan for Maranatha to use

government funds as a launching pad to create private enterprise . . . ."

13.     Not only did Defendants bilk Medicaid into funding these purported "private

enterprise[s]," but these for-profit entities often simply served as conduits to funnel funds and

consulting fees to Coley's family.  Over the course of a decade, not one of these ventures ever

launched a product or service or earned a single dollar in revenue.

14.     Defendants took steps to conceal their fraud.  For example, with respect to

payments to Coley's daughter, initially Maranatha did not pay her directly, but through an

intermediary entity controlled by Defendants, which was then reimbursed by Maranatha for Coley's daughter's salary.  Later, Coley's daughter was paid through a limited liability corporation she created.  In addition, Defendants did not reveal to Maranatha's auditors the nature of all the costs that were included as "allowable" in the CFRs.

15.     Coley was asked under oath, "[W]hen you revised, approved and signed the CFRs covering these periods, you knew that the expenses for your non-Medicaid projects were being included among allowable costs, right?"  Coley refused to answer, invoking his Fifth Amendment right not to incriminate himself.  He was also asked under oath, "[S]ince 2010, despite knowing it was wrong to request and accept reimbursement from Medicaid for the costs of your non-Medicaid projects, you did it anyway, right?"  Again, he refused to answer, invoking his Fifth Amendment right not to incriminate himself.  Coley did the same when asked about claiming as "allowable" costs excessive salaries and consulting fees paid to himself and his family members, as well as his own personal expenses.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over the claims brought under the FCA pursuant to 31 U.S.C. § 3730(a) and 28 U.S.C. §§ 1331 and 1345, and over the common law claims pursuant to 28 U.S.C. § 1345.

17.     This Court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), which provides for nationwide service of process.

18.     Venue lies in the Southern District of New York pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and 1391(c), because Coley resides in this district, Maranatha does business in this district, and the false or fraudulent acts occurred in this district.

19.     No official of the United States charged with responsibility to act in the circumstances knew or should have known of the facts material to the claims alleged herein prior

to September 27, 2018, the date relator's counsel first advised the government of relator's allegations.

## PARTIES

20.     Plaintiff is the United States of America suing on its own behalf and on behalf of the United States Department of Health and Human Services and its component agency, the Centers for Medicare and Medicaid Services, which administers and oversees the Medicaid program.

21.     Defendant Maranatha is a non-profit organization registered with the State of New York.  It is headquartered in this district, in Poughkeepsie, New York.  Maranatha provides services to individuals with developmental disabilities and their families in New York, including in this district.  Maranatha operates group homes called Individualized Residential Alternatives ("IRAs") for such individuals and offers a variety of other services, including through a community habilitation program that assists families in caring for such individuals in their own homes, a family support program, and a day habilitation program for individuals with developmental disabilities.  The vast majority of Maranatha's funding comes from Medicaid.

22.     Defendant Henry Allen Coley, a resident of this district, is the founder of Maranatha and served as CEO until he retired on or about July 31, 2021.  As alleged below, Coley committed or directed many of the false or fraudulent acts at issue here.

23.     Relator Stephanie Munford, a resident of New York, worked for Maranatha from 2000 to 2018, most recently as Maranatha's Chief Operations Officer.  On September 28, 2018, relator filed a complaint in the United States District Court for the Southern District of New York pursuant to the *qui tam* provisions of the FCA alleging, *inter alia*, that Defendants violated the FCA as they used Medicaid funds to pay for low-show and no-show jobs and consulting

contracts awarded to Coley and his family, for private ventures and pet projects of Coley's, and for Coley's personal expenses.

## BACKGROUND

### I.     The False Claims Act

24.     The FCA establishes liability for treble damages and civil penalties to the United States for an individual who, or entity that, "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(A), (B).  "Knowingly" is defined to include "actual knowledge," "act[ing] in deliberate ignorance of the truth or falsity of the [relevant] information," or "act[ing] in reckless disregard of the truth or falsity of the information."  *Id.* § 3729(b)(1).  The FCA "require[s] no proof of specific intent to defraud."  *Id.*

### II.    Medicaid Reimbursements for Services Provided to Individuals with Developmental Disabilities

25.     Medicaid is a joint federal and state program created in 1965 that provides healthcare benefits to certain groups, primarily the poor and those with disabilities.  42 U.S.C. § 1396 *et seq.*  Under Medicaid, each state establishes its own eligibility standards, benefit packages, payment rates, and program administration rules in accordance with certain federal statutory and regulatory requirements.  The state directly pays the healthcare providers for services rendered to Medicaid recipients, with the state obtaining the federal share of the Medicaid payment from accounts which draw on the United States Treasury.  *See* 42 C.F.R. § 430.0 *et seq.*

26.     The federal portion of each state's Medicaid payments, known as the Federal Medical Assistance Percentage, is based on the state's per capita income compared to the

national average.  42 U.S.C. § 1396d(b).  Federal funding under Medicaid is provided only when there is a corresponding state expenditure for a covered Medicaid service to a Medicaid recipient.  The federal government pays to the state the statutorily established share of the "total amount expended . . . as medical assistance under the State plan."  42 U.S.C. § 1396b(a)(1).

### A.      Maranatha's Medicaid-Funded Programs

27.      Maranatha offers six programs for developmentally disabled individuals, all of which are funded by Medicaid.  Two of these programs are rate-based programs, which means that Maranatha is reimbursed based on provider-specific rates set by NYDOH.  The other four programs are funded through fees set by NYDOH that are the same for all providers ("fee-based" programs).

28.      Maranatha operates two rate-based programs: a residential habilitation services program and a day habilitation program.  Through its residential habilitation services program, Maranatha houses individuals with developmental disabilities in long-term group homes, called IRAs, which are certified by New York State Office for People with Developmental Disabilities ("OPWDD") to provide room, board, and individualized services and care to residents.  Through its day habilitation program, Maranatha offers individuals with developmental disabilities an opportunity to socialize and participate in skill-based activities.

29.      Maranatha also administers four fee-based programs: a community habilitation program, in which skills are taught at the homes of individuals with developmental disabilities to assist with activities of daily living; a family support program, which provides services to family members of individuals with developmental disabilities; an after-school program, which offers activities for school-aged individuals with developmental disabilities; and a family care program, in which individuals with developmental disabilities are housed with a family in their community under the supervision of a caregiver.

30. The bulk of Maranatha's revenue and expenses relate to its two rate-based programs. For example, in its fiscal year ending June 30, 2019, Maranatha received more than $7.3 million from Medicaid claims for its residential and day habilitation programs—more than three-quarters of Maranatha's total revenue of $9.5 million. Similarly, Maranatha reported expenses of more than $5.8 million in connection with these programs—nearly three-quarters of its total programmatic expenses and nearly two-thirds of its overall expenses.

**B.     NYDOH's Reliance on Provider Cost Reports When Setting Rates for Rate-Based Programs**

31. As noted above, OPWDD-certified providers like Maranatha receive reimbursements for rate-based programs based on provider-specific reimbursement rates set by NYDOH. In setting those provider-specific reimbursement rates, NYDOH relies in large part on the actual costs of providing those services, as reported by those providers.

32. To provide this critical cost information, OPWDD-certified providers like Maranatha are required to submit annual CFRs to NYDOH. In the CFR, the provider is required to report all of its expenses, distinguishing between "allowable" costs—those necessary and reasonable for the provision of Medicaid services—and "non-allowable" costs.

33. In a process called rate setting, NYDOH establishes provider-specific reimbursement rates for rate-based programs, which are per person and per unit of service (*i.e.*, a day or half-day). Typically, a provider that reports greater allowable costs for a program will be granted a higher reimbursement rate.

34. For some programs, NYDOH additionally considers regional average "allowable" costs when setting rates. Thus, when a provider falsely inflates the "allowable" costs it reports to NYDOH, it can cause Medicaid to make inflated payments not just to that provider, but also to other providers in that region.

9

35.     NYDOH usually updates these provider-specific reimbursement rates for rate-based programs every two years, taking into account changes in "allowable" costs reported by the provider.

###     C.     Consolidated Fiscal Reports

36.     New York's Consolidated Fiscal Reporting and Claiming Manual ("CFR Manual") governs the submission of CFRs.  OPWDD regulations require that providers like Maranatha comply with the CFR Manual.  *See* 14 NYCRR § 635-4.2(a)(2) (requiring providers submit annual cost reports "in the form and format specified by OPWDD," which are set out in the CFR Manual).

37.     As noted above, a provider is required to report all expenses in its annual CFR and distinguish between "allowable" and "non-allowable" costs.  As the CFR Manual defines it, an "allowable" cost "must be reasonable and/or necessary for providing [Medicaid-funded] services in both its nature and amount. . . .  Unreasonable and/or unnecessary costs are not allowable."  CFR Manual § 57.1.

38.     The CFR Manual includes an illustrative list of "non-allowable" costs, including:

- "Costs incurred by a service provider as a result of making a monetary or non-monetary contribution to another individual or organization . . . ."

- "Costs of investment counsel and staff and similar expenses incurred solely to enhance income from investments."

- "Costs applicable to services, facilities and supplies furnished to the provider by a related organization . . . are excluded from the allowable cost of the provider if they exceed the cost to the related organization.  Therefore, such cost must not exceed the lower of actual cost to the related organization or the price of comparable services, facilities, or supplies that could be purchased elsewhere."

- "Costs that are not properly related to program/site participant care or treatment and which principally afford diversion, entertainment, or amusement to owners, operators or employees."

- "Costs associated with the conferring of gifts or providing cash payment to an individual when the primary intent is to confer distinction on, or to symbolize respect, esteem or admiration for the recipient."

- "Expenses that are prohibited by Federal, State, or local laws."

CFR Manual § 57.1-2.

39.     The CFR Manual requires that an independent accountant audit the provider's financial statements, which are to be submitted with the CFR, and sign a certification attesting that the "financial statements . . . present fairly, in all material respects, the . . . financial position" of the provider as of the relevant date, as well as "changes in [its] net assets or equity and its cash flows for the year then ended . . . ."  The independent accountant's certification expressly states that certain information in the CFR, including portions where the provider separates "non-allowable" costs from "allowable" costs, "is the responsibility of [the provider's] management."

### D.      Submitting Claims for Reimbursement by Medicaid

40.     To make a claim for reimbursement in connection with a rate-based Medicaid program, an OPWDD-certified provider like Maranatha submits a claim for each Medicaid beneficiary for service provided on a particular date.  Medicaid pays the provider based on the provider's reimbursement requests across each program.  The amount of the Medicaid payment is calculated as follows: the provider-specific reimbursement rate set by NYDOH for each program is multiplied by the number of units of service across beneficiaries.

41.     To bill Medicaid as a servicing provider, Maranatha was required to enter into an agreement and sign and submit an annual certification, called the Certification Statement for Provider Billing of Medicaid.  Coley, as Maranatha's CEO, annually signed this certification.  In relevant part, that Certification Statement states as follows:

11

[A]ll claims submitted electronically or on paper to the State's Medicaid fiscal agent . . . will be subject to the following certification.

I have read the eMedNY Provider Manual and all revisions thereto; all claims are made in full compliance with the pertinent provisions of the Manual and revisions . . . ALL STATEMENTS, DATA AND INFORMATION TRANSMITTED ARE TRUE, ACCURATE AND COMPLETE TO THE BEST OF MY KNOWLEDGE; NO MATERIAL FACT HAS BEEN OMITTED . . . .

In submitting claims under this agreement I understand and agree that I (or the entity) shall be subject to and bound by all rules, regulations, policies, standards, fee codes and procedures . . . as set forth in . . . . publications of the Department [New York State Department of Health], including eMedNY Provider Manuals and other official bulletins of the Department . . . .

42.     The "rules, regulations, policies, standards, . . . and procedures . . . as set forth in . . . publications of [NYDOH]" include the CFR Manual and the rules it sets out with respect to reporting "allowable" and "non-allowable" costs.   And the eMedNY Provider Manual itself directs providers to abide by OPWDD regulations that require providers to comply with the CFR Manual.  *See* eMedNY Provider Manual, OPWDD HCBS Waiver Manual, Policy Guidelines Sec. II (requiring compliance with Part 635 of Title 14 of the New York Code of Rules and Regulations); 14 NYCRR § 635-4.2(a)(2).

**DEFENDANTS' FRAUDULENT SCHEME**

43.     From at least 2010 through 2019, Defendants annually submitted false CFRs to the State of New York, reporting as "allowable" costs—costs reasonable and necessary for the provision of Medicaid-funded services—millions of dollars in expenses that had nothing to do with Maranatha's provision of Medicaid-funded services.

44.     As described in detail below, Defendants' falsely reported costs included (I) expenses of for-profit ventures and pet projects unrelated to Maranatha's provision of Medicaid-funded services; (II) excessive salaries and consulting fees paid to Coley's family, often in exchange for little to no work; and (III) the majority of Coley's salary, as well as Coley's personal expenses.

45.     Coley was aware these "non-allowable" costs were falsely reported as "allowable" costs in Maranatha's CFRs, which he signed.  Other senior Maranatha executives and board members approved or ratified these expenditures and were either aware of these false cost reports or acted in reckless disregard of their truth or falsity.

I.     **Defendants Falsely Claimed as "Allowable" Costs Millions Spent on For-Profit Ventures and Pet Projects**

46.     From at least 2010 to 2019, Defendants submitted CFRs falsely claiming as "allowable" costs millions of dollars spent on Defendants' for-profit ventures and pet projects, which were unrelated to Maranatha's provision of Medicaid-funded services.

47.     Over the last decade, Defendants have owned or controlled a number of companies, many of which were for-profit entities.  At Coley's direction, and with the approval of its board, Maranatha paid for expenses related to these for-profit ventures, as well as various unincorporated pet projects.

48.     Though Defendants hoped that these ventures would generate revenue, one of their chief purposes was to serve as vehicles to funnel money to Coley's daughter, as well as others associated with Coley, whom Maranatha paid for work they purportedly did to support these ventures and projects.

## A.    Defendants' For-Profit Ventures and Pet Projects

49.    Since 2014, Coley has operated Mighty Mite Distributors Inc. ("Mighty Mite"), a for-profit entity.  Initially, Coley claimed Mighty Mite would launch an online home goods store; in 2015, he scrapped that idea and claimed Mighty Mite would instead become an online wellness hub.

50.    In 2015, Defendants created Wellness 365 Inc. ("Wellness 365"), a for-profit entity owned by Maranatha and controlled by Coley.

51.    Coley launched another for-profit entity, Caregiver Compass LLC ("Caregiver Compass"), in 2018.  Coley controls the company and owns a 40% interest; his daughter owns 20%, his friend owns another 20%, and Maranatha holds the final 20% stake.  Coley claimed that Caregiver Compass would develop a web-based tool to assess caregivers that he would market to healthcare providers.

52.    The following year, in 2019, Coley launched yet another for-profit entity, Caregivers Connect, LLC ("Caregivers Connect").  Coley controlled the company, which purportedly was founded to provide nonmedical services to seniors.

53.    Not one of these ventures—Mighty Mite, Wellness 365, Caregiver Compass, and Caregivers Connect—ever launched a single product or service or generated a single dollar of revenue.

54.    Maranatha also funded a number of pet projects that were unrelated to its provision of Medicaid-funded services.  These projects included a program for housing veterans that never launched, for which Maranatha purchased (at Coley's direction) a house for more than $200,000; a marriage ministry; a prison ministry; a youth services program; and an abstinence program.

14

### B.   Maranatha Paid for Costs Related to These For-Profit Ventures and Pet Projects

55.   At Coley's direction and, in many cases, with the Maranatha board's blessing, Maranatha staff paid for expenses related to Defendants' for-profit ventures and pet projects.

56.   Defendants reassigned Maranatha employees and contractors who were otherwise engaged in work related to Maranatha's provision of Medicaid-financed services, directing them to spend a significant portion of their working hours—paid for by Maranatha—on one of these for-profit ventures or pet projects.  For instance, from 2011 through 2014, Munford and two other Maranatha employees were assigned to Defendants' youth services project.  For months at a time, they spent between one-quarter and one-half of their working hours on this pet project, which was not related to Maranatha's provision of Medicaid-funded services.

57.   Many of the payments Maranatha made to support these for-profit ventures and pet projects found their way into the pockets of Coley, his family, and his friends.

58.   At Coley's direction, Maranatha staff paid his wife and certain friends to act as consultants in connection with his for-profit ventures.  One of these friends was compensated by Maranatha more than $45,000 for work he purportedly did for Caregiver Compass LLC, when Coley had already given him a 20% ownership interest in the company.

59.   As described in more detail below, *see infra* ¶ 100, Maranatha also compensated Coley for the time he devoted to working on these ventures and projects.  Maranatha's board allowed him to spend the vast majority of his time developing these other ventures.  Indeed, in 2014, the board agreed to hire a Chief Operating Officer who would take over Coley's remaining day-to-day responsibilities for Maranatha, to allow Coley to focus on Defendants' for-profit ventures and pet projects.

### C.      Payments to Coley's Daughter

60.     Since 2012, at Coley's direction, Maranatha staff paid more than $300,000 to Coley's daughter in the form of annual "retainers," in addition to paying thousands of dollars for her mobile telephone plan, for work she purportedly performed in connection with Defendants' for-profit ventures and pet projects.

61.     For example, Coley directed that Maranatha pay his daughter to do "research" for Mighty Mite and create a website for the company.  In addition, after Defendants created Wellness 365, Coley directed Maranatha to pay his daughter to do "research" and assist with "project development" for Wellness 365.  Similarly, after he created Caregivers Connect, Coley directed Maranatha to pay his daughter to assist with that venture.  Maranatha staff made these payments.

62.     In 2012, Coley set his daughter's annual "retainer" at $21,600 a year.  In 2014, Coley increased it to $40,000, and then to $45,600 in 2016.  In May 2020—at the height of the pandemic in New York, and not long before Maranatha requested a $1 million loan from the Paycheck Protection Program—Coley gave his daughter a 40% raise, increasing her "retainer" to $65,000.

63.     These costs were "non-allowable" because they were unrelated to Maranatha's provision of Medicaid-funded services.  They were also "non-allowable" because Coley's daughter performed little work in exchange for her annual "retainers," rendering the costs excessive.  Under oath, Coley's daughter conceded that in earlier years, she may have worked no more than 10 hours per week for her father; in later years, when she claimed to have worked the most, she said she may have worked no more than 20 hours per week.  Coley's daughter rarely came to Maranatha's office.  She submitted largely identical invoices to Maranatha each month, claiming to do "research" and "project development" for Defendants' for-profit ventures and pet

projects, as well as to provide "virtual" administrative support to her father—despite the fact that, until late 2017, one of Maranatha's administrative assistants was assigned exclusively to Coley.  Her invoices did not report the number of hours she worked.

64.     Coley was asked under oath, "[Y]ou knew you were having Maranatha pay [your daughter] far more than the fair market value for her time, correct?"  And "as her supervisor, you knew that, in fact, [she] had done little to no work each month, right?"  Coley refused to answer both questions, invoking his Fifth Amendment right not to incriminate himself.

65.     Knowing these payments to Coley's daughter were excessive and inappropriate, Defendants took various steps to conceal them.

66.     First, Defendants initially avoided direct payments to Coley's daughter.  Until April 2016, Maranatha paid funds into a bank account in the name of Three Angels Foundation ("Three Angels"), another non-profit Defendants controlled; Maranatha staff then wrote a check from that Three Angels account to Coley's daughter.

67.     When Maranatha's Chief Financial Officer challenged the propriety of this practice, Coley told her these funds should be characterized as a loan from Maranatha to Three Angels.

68.     Thereafter, from April 2016 through September 2018 Coley's daughter was paid directly by Maranatha as an independent contractor.  Subsequently, she formed her own limited liability corporation, which served as a conduit for payments from Maranatha.

69.     Second, to excuse the fact that Coley's daughter rarely came to the office, Maranatha entered into independent contractor agreements with her that expressly provided that she did not have to work at Maranatha's office or even work a fixed schedule.  The chair of Maranatha's board signed these agreements.

70.     Third, to hide the fact that his daughter did little work in exchange for her annual "retainers," Coley arranged for his daughter to report directly to him.

71.     Fourth, when an auditor advised that the Maranatha board had to approve this and other financial relationships with Coley's family members, Coley directed the Maranatha board retroactively to rubber stamp those relationships.  As described below, it did so.  *See infra* ¶ 80.

72.     Fifth, Defendants concealed from the independent accounting firm that audited certain sections of Maranatha's CFRs that Maranatha was paying these and other costs of for-profit ventures and pet projects unrelated to its provision of Medicaid-funded services.

73.     From at least 2010 to 2019, Defendants falsely claimed the "retainers" paid to Coley's daughter, as well as Defendants' other expenses related to its for-profit ventures and pet projects, as "allowable" costs on Maranatha's CFRs.  Because these expenses were unrelated to Maranatha's provision of Medicaid-funded services, they were neither reasonable nor necessary costs of such services and therefore were "non-allowable."

## II.     Defendants Falsely Claimed as "Allowable" Costs Excessive Salaries and Consulting Fees Paid to Coley's Family, Often in Return for Little to No Work

74.     Each year from at least 2010 to 2019, Defendants falsely claimed as "allowable" costs on Maranatha's CFRs excessive salaries and consulting fees Maranatha paid to Coley and his family, often in return for little to no work.  These excessive payments include payments to Coley himself, *see infra* ¶¶ 92-108, and Coley's daughter, *see supra* ¶¶ 60-73, as well as payments to Coley's brother and son, which are addressed below.

### A.     Payments to Coley's Brother

75.     At Coley's direction, Maranatha hired his brother as a consultant purportedly to assist human resources staff and guaranteed him at least $3,000 each month.  Between May 2016 and November 2019, Maranatha staff paid more than $175,000 to Coley's brother.

76.     Coley's brother lived several hundred miles away from Maranatha's offices. When he decided to visit Coley, Maranatha paid, at Coley's direction, for his brother's travel and lodging expenses.

77.     Coley's brother performed little work for Maranatha.  On occasion, Coley's brother offered diversity training to Maranatha staff; he was also named Maranatha's "Diversity Ombudsman," though he did little in connection with that title.  According to the first contract he signed with Maranatha, Coley's brother was tasked with updating Maranatha's employee handbook and establishing a "Diversity Council."  He did neither.

78.     The fees Maranatha paid Coley's brother were substantially in excess of the fair market value of any work he actually performed for the organization.

79.     In 2018, Maranatha's board received a letter from Munford, who was then Maranatha's COO, as well as two anonymous letters, alleging that Coley was misappropriating Maranatha's funds to divert money to himself and his family, specifically highlighting the payments to Coley's brother.  When Maranatha's auditor investigated, Coley falsely claimed that his brother had been hired not by Coley but instead by Munford.  In reality, Coley had directed the hiring of his brother and Munford only signed the contractor agreement with Coley's brother because Coley instructed her to do so.  Coley falsely denied involvement in hiring his brother because he knew it was wrong.

80.     Similarly, in the fall of 2019, Coley advised the board, by email, that Maranatha's auditor had asked for "board minutes that reflect that [payments to Coley's family were] discussed and approved."  Coley directed the board to generate such minutes, providing few details about these payments; Coley did not even disclose how much his family had been paid by Maranatha.  The board raised no question or objection; it promptly conducted a vote by email in

order to "generate minutes" that "acknowledge disclosure and approve of" payments to four of Coley's family members, including his daughter, brother, and son.  In Coley's email to the board, he repeated the false claim that his brother had been hired by Munford, rather than by Coley.

81.     Defendants claimed the $175,000 in payments to Coley's brother as "allowable" costs on Maranatha's annual CFRs.  Because this was far in excess of the fair market value of the little work Coley's brother actually performed, these costs were not, in fact, "allowable" costs reasonable and necessary for the provision of Maranatha's Medicaid-funded services.

82.     Coley was asked under oath whether he "knew this was wrong," given that his brother "was doing little work" and "was being paid far more than the fair market value for his time."  Coley refused to answer, invoking his Fifth Amendment right not to incriminate himself.

**B.     Payments to Coley's Son**

83.     Coley first directed Maranatha to hire his son as a caretaker for Maranatha's IRA residents.  After a series of complaints, Coley was forced to remove his son from that position and directed that Maranatha employ him as a maintenance worker instead.

84.     Coley's son was frequently absent from work.  To avoid complaints that would arise if Coley's son were responsible for maintaining a particular IRA facility, Coley instructed the head of maintenance that Coley's son should not "be responsible at any house."

85.     In 2017, Coley's son formed his own company and Coley had Maranatha contract with that company to clean Maranatha's office.  This was done to increase the compensation provided to Coley's son.

86.     Between March 2017 and September 2020, Coley's son received nearly $70,000 in fees through this company, on top of his annual salary as a maintenance worker for Maranatha.

87.     Coley knew the consulting fees paid to his son were excessive.

88.     Maranatha's COO, Munford, objected to Coley hiring his son as a contractor, as well as an employee, but Coley overruled her.  He explained, in an email, that he allowed many employees to hire their children, noting that he had personally approved three employees' requests to hire their son or daughter.  In that same email, he told the COO that Maranatha's Chief Financial Officer would supervise his son.  In fact, the CFO did not supervise Coley's son; Coley's son reported directly to Coley with respect to cleaning services he purportedly performed in Maranatha's office.

89.     At Coley's direction, Coley's son submitted false invoices to Maranatha in which he claimed to have performed cleaning services at Maranatha's office when he had not.  In these invoices, Coley's son claimed to have cleaned Maranatha's office on days when he had a 10-hour shift cleaning Maranatha IRA facilities and on days when he called out sick from his shift in the IRA facilities.  Maranatha staff paid these invoices.

90.     Defendants claimed the nearly $70,000 in contractor fees to Coley's son as "allowable" costs on Maranatha's annual CFRs.  Because this was far in excess of the fair market value of the little work Coley's son actually performed in Maranatha's office, these fees were not, in fact, "allowable" costs reasonable and necessary for the provision of Maranatha's Medicaid-funded services.

91.     Coley was asked under oath whether he "knew [it] was wrong" to claim all salary and consulting fees paid to his son as "allowable" costs, given that Maranatha "was paying [his son] far more than fair market value" and "paying [him] for work he wasn't actually doing."  Coley refused to answer, invoking his Fifth Amendment right not to incriminate himself.

**III.    Maranatha Paid More Than $1.5 Million to Coley in "Non-Allowable" Costs and Then Falsely Claimed Those Expenses as "Allowable"**

92.    Since 2010, Maranatha paid Coley more than $1.5 million in "non-allowable" costs, including salary and benefits compensating Coley for time he was either not working or was working for the benefit of Defendants' for-profit ventures and pet projects.  Maranatha also paid for tens of thousands of dollars in Coley's personal expenses.

93.    Coley received excessive compensation incommensurate with the little work he actually performed for Maranatha.

94.    Since 2010, Coley regularly worked sixteen or fewer hours each week.  Indeed, his calendar shows only six hours were scheduled each week, on average, and nearly all of his meetings and calls were scheduled between 11 am and 4 pm.

95.    Maranatha executed an employment agreement with Coley back in 2008 that explicitly afforded him full discretion to establish his work schedule.  The agreement provided that Coley was "not [to] be held to an[y] specific periodic work schedule or required to devote a specific amount of time to his duties provided that [he] devote[s] sufficient time to properly carry out his responsibilities . . ."

96.    Yet when Coley was asked to submit timesheets, in 2015 and 2016, he submitted false ones, claiming to work 32 hours per week.  And as described below, *see supra* ¶ 119, Maranatha falsely reported on its annual CFRs that Coley worked at least 32 hours per week.

97.    Coley was asked under oath, "Since 2010, isn't it true that, in fact, you worked 16 hours a week or fewer, on average, for Maranatha?"  Coley refused to answer, invoking his Fifth Amendment right not to incriminate himself.

98.    In return, since 2010, Maranatha paid Coley more than $2 million dollars in compensation, including salary and benefits.  Between 2011 and 2013, Coley received an annual

salary from Maranatha of $130,000.  In May 2014, the board—at Coley's direction—amended

his employment agreement to give him a retroactive raise of more than 50%.  That amendment

increased Coley's salary to $199,000, effective almost five months earlier.  With benefits,

Coley's total annual compensation exceeded $225,000.

99.     Per New York Executive Order 38, non-profit organizations like Maranatha are

subject to a cap that limits a full-time executive's total compensation—inclusive of salary and

benefits—to $199,000, absent a waiver.  Defendants did not receive such a waiver.

100.    Of the time Coley did spend working, the vast majority was devoted to

Defendants' for-profit ventures and pet projects.  When asked under oath, "Since 2010, of the

hours you were actually doing work for Maranatha, isn't it true that you spent at least 75 percent

of those hours on your non-Medicaid project[s]," Coley declined to answer, invoking his Fifth

Amendment right not to incriminate himself.  Coley spent no more than 4 hours per week, on

average, on work concerning Maranatha's provision of Medicaid-funded services.

101.    Defendants falsely claimed the entirety of the $2 million in compensation paid to

Coley as "allowable" costs on Maranatha's annual CFRs.  Because this was far in excess of the

fair market value of the time Coley actually spent working on matters concerning Maranatha's

provision of Medicaid-funded services, the full amount of Coley's compensation was not, in fact,

an "allowable" cost reasonable and necessary for the provision of those services.

102.    In addition, Maranatha paid tens of thousands of dollars to cover Coley's personal

expenses.  Defendants falsely reported these reimbursed personal expenses as "allowable" costs

on Maranatha's annual CFRs.

103.    For example, since 2015, Maranatha paid more than $34,000 for personal training

sessions for Coley at his gym.

104.     In December 2016, Maranatha paid $1,200 for Coley's personal holiday gifts, including Chanel perfume and skin care products.  Two years later, in December 2018, Maranatha once again paid approximately $1,200 for Coley's holiday gifts, which that year included a purchase at Coach.

105.     Maranatha also repeatedly paid for Coley's family meals.

106.     And Maranatha paid for jewelry Coley purchased.  Even after learning of the government's investigation in this matter, Coley charged jewelry to his Maranatha credit card.

107.     These personal expenses were neither reasonable nor necessary for Maranatha's provision of Medicaid-funded services.  Nonetheless, from at least 2010 to 2019, Defendants falsely reported these expenses among "allowable" costs in Maranatha's CFRs.

108.     When confronted under oath about falsely claiming these personal expenses as "allowable" costs in Maranatha's CFRs, Coley refused to answer questions, invoking his Fifth Amendment right not to incriminate himself.

**IV.    Maranatha's Board Was Aware and Approved of the Use of Maranatha Funds to Pay for Expenses That Were Improperly Claimed As "Allowable" Expenses**

109.     Maranatha's board knew that Maranatha was using government funds for Defendants' for-profit ventures and pet projects.  As reflected in minutes of Maranatha's board meetings, Coley often reported on Defendants' for-profit ventures.

110.     Indeed, as Coley acknowledged in one of his presentations to the Maranatha board: "It was always the plan for Maranatha to use government funds as a launching pad to create private enterprise . . . ."

111.     Maranatha's board approved Coley's devoting his time principally to these for-profit ventures and pet projects.  For example, in 2014, the board approved an amendment to Coley's employment agreement authorizing Coley to "recruit a Chief Operating Officer" to

whom Coley would "delegate significant day-to-day managerial duties" so that Coley could "devote more time and attention with respect to long-range planning," to "include pursuing, evaluating strategic opportunities, program enhancements and social service alliances . . . ." These "strategic opportunities" were Defendants' for-profit ventures and pet projects.

112.    As the board noted in a January 2018 resolution, "the board, Maranatha Human Services has authorized its president and CEO, HA Coley to develop initiatives that will allow MHS to benefit from or generate non-Medicaid funded income" and "the board of MHS has authorized the formation of for-profit corporations and not-for-profit corporations to pursue various avenues of alternative funding."  The resolution acknowledged that the board "allow[ed] HA Coley to utilize a percentage of his time to develop and pursue these initiatives and to develop the for-profit corporations" and that Maranatha would "provide resources to pay for the development of the Caregiver Compass," Defendants' primary for-profit venture at the time. The board explained it was funding Coley's for-profit ventures and allowing Coley to spend his time—paid for by Maranatha—on them, provided Maranatha receive an undefined percentage of "shares in each and any for-profit corporation formed to pursue these [for-profit] initiatives."

113.    Maranatha's board also ratified the excessive salaries and consulting fees paid to Coley's daughter, brother, and son.  As described above, when an auditor requested proof that the board had approved Maranatha's financial arrangements with Coley's family members in 2019, the board promptly approved them, at Coley's direction.

## V.    Maranatha's CFRs

### A.    The False Information Defendants Submitted in Maranatha's CFRs

114.    As described above, each year, providers like Maranatha must submit a CFR to the State of New York in which they are required to report all of their expenses and separate the

"allowable" costs—those that are necessary and reasonable for the provision of Medicaid-funded services—from "non-allowable" costs.

115.    Each year from at least 2010 to 2019, Coley and Maranatha submitted a CFR falsely claiming as "allowable" costs at least tens of the thousands of dollars—and often hundreds of thousands of dollars—spent on Defendants' for-profit ventures and pet projects; excessive salaries and fees for Coley and his family; and Coley's personal expenses.  In total, over these years Defendants falsely reported millions of dollars of "non-allowable" costs as "allowable" costs.

116.    Although Coley signed each CFR, others were involved in preparing and approving the reports.  For example, Maranatha's current Fiscal Director prepared the cost information—including information about "allowable" and "non-allowable" costs.  The reports list Maranatha's CFO as having "Prepared" a certain schedule in each CFR and list the CFO as the "Person to Contact with Regard to Questions Concerning this Report."

117.    Though many of Maranatha's costs are aggregated in the CFRs, certain costs are itemized, including the cost of Coley's compensation and payments to "related parties" like Coley's family members.

118.    With respect to Coley, in Schedules CFR-4 and CFR-6, Defendants were required to report his salary and benefits, as well as the number of "hours paid"—that is, the number of hours of work for which Maranatha paid Coley.

119.    Defendants falsely claimed in Maranatha's CFRs that Coley worked more than he did, reporting from 2011 forward that he worked at least 1,600 hours a year (80% of full-time), when in fact Coley worked far less than that.

120.     With respect to related party transactions, Defendants were required to name the party, describe the transaction, identify the relationship to Maranatha, report the amount of the transaction, and report how much of this amount Defendants claimed as "allowable" costs.

121.     With the exception of Maranatha's payments to Coley's daughter prior to 2016 (which were routed through Three Angels), Defendants reported the payments to Coley's family members as related-party transactions and expressly claimed 100% of the amounts paid— including amounts paid to his daughter, his brother, and his son—as "allowable costs."

122.     Apart from executive compensation and related party transactions, which are itemized as described above, most of the rest of a provider's costs are reported in the aggregate across different categories set out in the CFR.  The CFR Manual requires that the provider identify how much of these costs are "non-allowable."  Specifically, in Schedule CFR-1 (line 66), Schedule CFR-2 (line 8), and Schedule CFR-3 (line 41), the provider must identify its "non-allowable" costs and then submit "detail" concerning those costs.

123.     With the exception of 2013, when Maranatha reported almost $130,000 in "non-allowable" administrative costs for reasons unrelated to this matter, each year from 2010 through 2019 Maranatha reported that it spent very little on "non-allowable" costs.  On average during these years (excepting 2013), Maranatha reported spending less than $10,000 a year on "non-allowable" costs.  The most it reported spending on "non-allowable" costs in a year (excepting 2013) was $16,450, in 2018.

124.     In fact, as described above, Maranatha regularly spent hundreds of thousands of dollars each year on "non-allowable" costs, including the costs of Defendants' for-profit ventures and pet projects, excessive salaries and fees paid to Coley and his family, and Coley's personal expenses.

125.     Defendants falsely reported these "non-allowable" costs as "allowable" costs by including these amounts among its reported costs but not identifying them as "non-allowable" in Schedules CFR-1, CFR-2, or CFR-3.

**B.     The False Certifications Defendants Submitted in Maranatha's CFRs**

126.     In each of the CFRs Defendants submitted from at least 2010 to 2019, Coley, as Maranatha's CEO, signed multiple certifications—each of which was false.

127.     First, each year Coley certified, in relevant part, that "THE INFORMATION FURNISHED IN THIS REPORT HAS BEEN COMPLETED IN ITS ENTIRETY, AND IS IN ACCORDANCE WITH THE INSTRUCTIONS AND IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE."  This was false, as Defendants disregarded the "instructions" provided in the CFR Manual regarding reporting of "allowable" and "non-allowable" costs, and for this reason the information in the CFR was not "true and correct to the best of [Coley's] knowledge."

128.     Second, each year Coley certified that "the attached statement [the CFR] fully and accurately represents all reportable income and expenditures made for services performed in accordance with the provision of the Mental Hygiene Law and approved budgets."  As Defendants misreported "non-allowable" costs as "allowable" costs, these did not "accurately represent[]" the true costs of Maranatha's provision of Medicaid-funded services but rather falsely inflated them.

129.     Third, in the CFRs submitted since 2018, Coley expressly certified that Maranatha had "reported and adjusted out all non-allowable expenses," and then certified under penalty of perjury that this was "true and correct to the best of my knowledge."  This was false, as Coley knew.

**VI.    Defendants Knowingly Submitted CFRs that Falsely Reported "Non-Allowable" Costs as "Allowable"**

130.    Each year from at least 2010 to 2019, Defendants submitted a CFR they knew falsely reported as "allowable" costs the "non-allowable" expenses described above: the expenses related to Defendants' for-profit ventures and pet projects, excessive salaries and contractor fees paid to Coley and his family, and Coley's personal expenses.

**A.    Coley's Knowledge, Which Is Imputed to Maranatha**

131.    Each year, Coley knew how much Maranatha had paid, at his direction, for his and Maranatha's for-profit ventures and pet projects; in excessive salaries and fees to himself and his family; and for his own personal expenses.  Coley knew these expenses were not "allowable" and that it was wrong to report them as such on Maranatha's CFRs.  But he did so anyway.

132.    At his deposition, Coley was asked:

- if, when he signed each annual cost report since 2010, he knew it was wrong to falsely report the costs of non-Medicaid projects as "allowable" costs;

- if he knew it was wrong to accept payment from Medicaid based on these false cost reports;

- if he nevertheless submitted cost reports each year since 2010 in which he falsely reported such costs as "allowable" costs; and

- if he directed staff at Maranatha to do the same.

In response to each of these questions, Coley declined to answer and invoked his Fifth Amendment right not to incriminate himself.

133.    Coley's knowledge is imputed to Maranatha.  Coley, Maranatha's CEO, was acting both for himself and for Maranatha, particularly as to the for-profit ventures from which Maranatha's board hoped Maranatha would profit.  Maranatha's board approved or ratified much

of this spending, including the costs of Defendants' for-profit ventures and pet projects and the excessive salaries and fees to Coley's daughter, brother, and son, as well as to Coley himself.

      **B.**     **Knowledge of Maranatha's Other Executives and Board Members**

134.    In addition, other executives at Maranatha who prepared or approved its CFRs, as well as Maranatha's board, knew Maranatha was falsely reporting "non-allowable" costs as "allowable" costs in its CFRs or acted in reckless disregard of the truth or falsity of Maranatha's reporting of "allowable" costs.

135.    Maranatha's Fiscal Director, who compiled the cost information reported on Maranatha's CFRs, knew of Maranatha's spending on Defendants' for-profit ventures and pet projects, salaries and consulting fees for Coley and his family, and on Coley's personal costs, yet included these costs as "allowable" costs in the information she prepared for Maranatha's CFRs. Indeed, Maranatha's Fiscal Director internally categorized some of the expenditures related to Defendants' for-profit ventures as "Development" costs—totaling more than $320,000—yet included these as "allowable" costs in the information she prepared for the CFRs.

136.    Maranatha's current CFO, who has been in that role since 2016, knew Maranatha was spending considerable sums on these "non-allowable" costs, including the costs of Defendants' for-profit ventures and pet projects, and knew that the vast majority of Coley's time and his daughter's time was not spent on the provision of Medicaid-funded services. Maranatha's CFO allowed herself to be listed as the person who "Prepared" a certain schedule in the CFRs and as the "Person to Contact with Regard to Questions Concerning this Report [the CFR]," though these CFRs reported minimal "non-allowable" costs and expressly reported all of the compensation paid to Coley's daughter as "allowable."

137.    As noted above, Maranatha's board approved or ratified many of the expenditures at issue and knew these costs were not "allowable" costs necessary and reasonable for the

provision of Maranatha's Medicaid-funded services. Maranatha's board members either knew Maranatha was falsely reporting "non-allowable" costs as "allowable" costs in its CFRs or acted in reckless disregard of the truth or falsity of Maranatha's reporting of "allowable" costs.

## VII. Defendants' Falsely Inflated Cost Reports Caused Medicaid to Pay Maranatha Millions of Dollars to Which It Was Not Entitled

138.    As described above, from at least 2010 to 2019, Defendants submitted cost reports falsely claiming millions of dollars in "non-allowable" costs as "allowable" costs.

139.    Defendants knew that NYDOH relied on the "allowable" costs reported in providers' CFRs to set the provider-specific reimbursement rates for Maranatha's two rate-based programs—its residential habilitation services program and its day habilitation program.

140.    Through the submission of these false cost reports, Defendants induced the State of New York to award Maranatha Medicaid reimbursement rates for these two programs that were higher than the State would have awarded had it known the actual "allowable" costs incurred by Maranatha.

141.    As a result of these fraudulently inflated reimbursement rates, Maranatha received millions of dollars in Medicaid reimbursements for these two rate-based programs to which it was not entitled and would not have received under reimbursement rates set according to Maranatha's true "allowable" costs. Because these falsely inflated cost reports increased regional average costs, which NYDOH considers when rate-setting, Defendants also caused NYDOH erroneously to inflate other regional providers' reimbursement rates and pay out additional Medicaid funds it would not have paid but for Defendants' false cost reports.

142.    The CFRs that Defendants submitted to NYDOH between 2010 and 2019 were false records or statements material to the false claims Maranatha made each time it submitted a

claim for Medicaid reimbursement for one of its two rate-based programs at a reimbursement

rate inflated by Defendants' falsely inflated cost reports.

143.    And each claim Maranatha submitted for Medicaid reimbursement for its

residential habilitation services program or its day habilitation program at these falsely inflated

reimbursement rates was a false claim.

144.    Each year Coley, as Maranatha's CEO, signed and submitted the Certification

Statement for Provider Billing of Medicaid described above on behalf of Maranatha.  Coley's

annual certifications stated that "[a]ll claims submitted" to New York's Medicaid fiscal agent

"will be subject to the following certification."  These certifications included representations

that:

- he and Maranatha "shall be subject to and bound by all rules, regulations, policies, standards, fee codes and procedures . . . at set forth in . . . publications of the [New York State] Department [of Health]"—which include the CFR Manual;

- "all claims are made in full compliance with the pertinent provisions of the [eMedNY Provider] Manual and revisions," which include regulations that require compliance with the CFR Manual; and

- "ALL STATEMENTS, DATA AND INFORMATION TRANSMITTED ARE TRUE, ACCURATE AND COMPLETE TO THE BEST OF MY KNOWLEDGE; NO MATERIAL FACT HAS BEEN OMITTED . . . ."

145.    Defendants knew that they had violated the CFR Manual when they submitted

CFRs falsely reporting "non-allowable" costs as "allowable" costs.  Defendants also knew that

these falsely reported costs caused NYDOH to grant Maranatha reimbursement rates for its two

rate-based programs that were higher than the rates to which Maranatha was entitled based on its

true "allowable" costs.  And, since at least 2010, when submitting claims for reimbursement for

Maranatha's two rate-based programs, Defendants omitted the material fact that they had

submitted falsely inflated cost reports.

146.     Accordingly, since at least 2010, each time Maranatha submitted a claim to New York's Medicaid fiscal agent requesting payments for its residential habilitation services program or its day habilitation program at these falsely inflated reimbursement rates, Defendants knew these claims to be false both because (a) they knew the above representations in the Certification Statement for Provider Billing of Medicaid, which applied to each of these claims, were false, and (b) they knew they were requesting reimbursement at a falsely inflated reimbursement rate.

**CLAIMS FOR RELIEF**

**COUNT ONE: PRESENTING FALSE CLAIMS FOR PAYMENT;
FALSE CLAIMS ACT**

147.     The United States repeats and realleges the allegations in paragraphs 1 through 146.

148.     The United States seeks relief against Coley and Maranatha under Section 3729(a)(1)(A) of the False Claims Act.

149.     Through the acts set forth above, Defendants, acting with actual knowledge or with deliberate ignorance or reckless disregard of the truth, presented, either directly or indirectly, false or fraudulent claims for payment to the government when requesting reimbursements for Maranatha's rate-based programs.  Specifically, Defendants, acting with actual knowledge or with deliberate ignorance or reckless disregard of the truth, presented false or fraudulent claims for reimbursement for these programs to the State of New York's Medicaid fiscal agent without disclosing that they had falsely reported "non-allowable" costs as "allowable" costs on Maranatha's CFRs, which inflated the reimbursement rates for these rate-based programs.

150.     The government made payments to the Defendants because of the false or fraudulent claims.

151.     If the government had known that Defendants had falsely reported these "non-allowable" costs as "allowable" costs, it would not have reimbursed Maranatha at these fraudulently inflated rates.

152.     By reason of the false or fraudulent claims, the United States has sustained damages in a substantial amount to be determined at trial and is entitled to treble damages plus a civil penalty for each violation.

## COUNT TWO: FALSE RECORDS AND STATEMENTS; FALSE CLAIMS ACT

153.     The United States repeats and realleges the allegations in paragraphs 1 through 152.

154.     The United States seeks relief against Coley and Maranatha under Section 3729(a)(1)(B) of the False Claims Act.

155.     Through the acts set forth above, Defendants, acting with actual knowledge or with deliberate ignorance or reckless disregard of the truth, made, used, or caused to be made or used false records and statements material to false or fraudulent claims to the government. Specifically, Defendants, acting with actual knowledge or with deliberate ignorance or reckless disregard of the truth, made, used, or caused to be made or used false or fraudulent records and statements—in the form of, *inter alia*, false claims data, false certifications, and false CFRs— that were material to the payment of false or fraudulent claims for Maranatha's rate-based programs by the State of New York's Medicaid fiscal agent.

156.     If the government had known that the records and statements were false, it would not have paid the claims.

34

157.    By reason of these false records and statements, the United States has sustained

damages in a substantial amount to be determined at trial and is entitled to treble damages plus a

civil penalty for each violation.

**COUNT THREE: UNJUST ENRICHMENT**

158.    The United States repeats and realleges the allegations in paragraphs 1 through

157.

159.    Through the acts set forth above, Defendants have received Medicaid payments to

which they were not entitled and therefore have been unjustly enriched.  The government paid

claims submitted to Medicaid by Maranatha at reimbursement rates that Coley and Maranatha

fraudulently obtained by submitting false cost reports and false certifications.  The circumstances

of these payments are such that, in equity and good conscience, Defendants should not retain

those payments, which are to be determined at trial.

**COUNT FOUR: PAYMENT UNDER MISTAKE OF FACT**

160.    The United States repeats and realleges the allegations in paragraphs 1 through

159.

161.    The United States seeks relief against Defendants to recover monies paid under

mistake of fact.

162.    The government paid money to Maranatha based on the CFRs and claims

submitted by Defendants under the erroneous belief that Defendants' certifications in the CFRs

were truthful; that Defendants accurately reported "allowable" costs in those CFRs; and that

Defendants' certifications in annual Certification Statements for Provider Billing of Medicaid

were truthful.  In making such payments, the government relied upon and assumed the truth of

those certifications and the reported "allowable" costs.  This erroneous belief was material to the

35

government's decision to pay Maranatha.  In such circumstances, the government's payments to

Maranatha were by mistake and were not authorized.

163.    Because of these payments by mistake, Defendants received monies to which they

are not entitled.

164.    By reason of the foregoing, the United States was damaged in a substantial

amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, the United States respectfully requests judgment to be entered in its favor

as follows:

(i)    On Counts One and Two (FCA violations), a judgment against Defendants for treble damages and civil penalties to the maximum extent allowed by law.

(ii)    On Counts Three and Four (unjust enrichment and payment under mistake of fact), a judgment against Defendants for damages to the extent allowed by law.

(iii)    A judgment against Defendants for costs and such other relief as the Court may deem appropriate.

Dated:  October 25, 2021
         New York, New York

                                    DAMIAN WILLIAMS
                                    United States Attorney for the
                                    Southern District of New York

                                    _____
                                    JACOB LILLYWHITE
                                    Assistant United States Attorney
                                    86 Chambers Street, Third Floor
                                    New York, New York 10007
                                    (212) 637-2639
                                    jacob.lillywhite@usdoj.gov

                                    *Counsel for the United States*