UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA, *and* STATE OF
NEW YORK, *ex rel.* STEPHANIE MUNFORD,

                              Plaintiffs,

   v.

MARANATHA HUMAN SERVICES, INC., *and*
HENRY ALFONSO COLEY,

                              Defendants.

---

No. 18-CV-8892 (KMK)

OPINION & ORDER

Appearances:

Heidi A. Wendel, Esq.
Law Office of Heidi A. Wendel PLLC
New York, NY
*Counsel for Plaintiff*

David A. Koenigsberg, Esq.
Menz Bonner Komar & Koenigsberg LLP
Rye Brook, NY
*Counsel for Plaintiff*

Tina Sciocchetti, Esq.
Michael J. Lingle, Esq.
Christopher J. Stevens, Esq.
Philip E. Rosenberg, Esq.
Neil P. Diskin, Esq.
Nixon Peabody LLP
Albany, Melville, and Rochester NY
*Counsel for Defendant Maranatha Human Services, Inc.*

KENNETH M. KARAS, District Judge:

    Plaintiff-Relator Stephanie Munford ("Plaintiff") filed this qui tam Action against

Maranatha Human Services, Inc. ("Defendant" or "Maranatha") and Henry Alfonso Coley

("Coley"),[1] alleging multiple violations of the federal False Claims Act ("FCA"), 31 U.S.C.

§ 3729, et seq.—including a retaliation claim under 31 U.S.C. § 3730(h)—and a single

retaliation claim under the New York State False Claims Act ("NYFCA"), N.Y. State Fin. Law

§ 191.  (*See* First Amended Relator's Complaint ("FAC") ¶¶ 37–57 (Dkt. No. 146).)[2]  Both the

United States of America (the "United States") and the State of New York intervened in this

Action, (*see* Compl. ("U.S. Compl.") (Complaint-in-Intervention of the United States) (Dkt. No.

23); Intervenor Compl. ("NYS Compl.") (Complaint-in-Intervention of the State of New York)

(Dkt. No. 41)), and have since settled their claims against Maranatha and Coley, (Stip. and Order

of Settlement and Dismissal (memorializing settlement between the State of New York and

Coley) (Dkt. No. 18); Stip. and Order of Settlement and Dismissal (memorializing settlement

between the United States and Coley) (Dkt. No. 19); Stip. and Order of Settlement and Dismissal

(memorializing settlement between the United States and Maranatha) (Dkt. No. 88); Stip. and

Order of Settlement and Dismissal (memorializing settlement between the State of New York

and Maranatha) (Dkt. No. 90)).

Before the Court is Maranatha's Motion for Summary Judgment (the "Motion") on

Plaintiff's remaining retaliation claims.  (*See* Not. of Mot. (Dkt. No. 151).)  For the following

reasons, Maranatha's Motion is denied.

---

[1] Coley is no longer a Defendant in this Action.  (*See generally* Dkt.)

[2] Unless otherwise noted (as here), the Court cites to the ECF-stamped page number in the upper righthand corner of each page.

I. Background

A. Factual Background

1. Materials Considered

The facts set forth below are taken from the Parties' statements pursuant to Local Civil

Rule 56.1, (*see* Def's Rule 56.1 Statement ("Def's 56.1") (Dkt. No. 153); Pl's Rule 56.1

Statement ("Pl's 56.1") (Dkt. No. 167); Def's Resp. to Pl's Add'l Mat. Facts ("Resp. to Add'l

Mat. Facts") (Dkt. No. 175)), as well as the admissible evidence submitted by the Parties.[3]  The

_____

[3] Maranatha contends that Plaintiff's Rule 56.1 Statement, including its Statement of Additional Material Facts, is "riddled with improprieties."  (Resp. to Add'l Mat. Facts 1–3.) Specifically, it points to: (1) the fact that many of Plaintiff's responses to Maranatha's statements of material fact are unnecessarily lengthy in violation of Local Rule 56.1, which requires that Rule 56.1 statements contain "short and concise" statements, (*see id.* at 1); (2) Plaintiff's argumentative tack in its Rule 56.1 Statement, which "contains innumerable statements of opinion and legal conclusions," (*see id.* at 2); (3) the lack of citations in certain paragraphs, (*see id.*); (4) citations to pleadings in this Action in other paragraphs, (*see id.*); and (5) the fact that many of Plaintiff's responses are "non-responsive" to its corresponding statements, (*see id.* at 2– 3).  Thus, Maranatha urges the Court to "disregard Plaintiff's improper responses and deem any facts to which Plaintiff failed to properly respond admitted."  (*See id.* at 3.)

Courts in the Second Circuit regularly deem facts admitted where a party fails to specifically controvert a statement in its denial.  *See, e.g.*, *Scarpinato v. 1770 Inn, LLC*, No. 13- CV-955, 2015 WL 4751656, at *2 n.3 (E.D.N.Y. Aug. 11, 2015) ("[A]ny of the [d]efendants' Rule 56.1 statements that are not specifically controverted are deemed admitted.").  The Court will thus deem facts admitted where Plaintiff fails to cite to relevant facts in its purported denial.

It is also common practice to deem a fact admitted where a party's denial is based on mere semantic complaints as to the wording of the statement.  *See Arch Specialty Ins. Co. v. TDL Restoration, Inc.*, No. 18-CV-6712, 2021 WL 1225447, at *1 n.1 (S.D.N.Y. Mar. 31, 2021) ("Where the [p]arties identify disputed facts but with semantic objections only or by asserting irrelevant facts, [the Court will not consider] these purported disputes, which do not actually challenge the factual substance described in the relevant paragraphs, . . . as creating disputes of fact.") (collecting cases).  The Court will therefore deem a fact admitted where Plaintiff's denial is based on a challenge to the wording of the statement.

Further, it is black-letter law in the Second Circuit that Rule 56.1 statements and responses "*are not [legal] argument*.  They should contain factual assertions with citation to the record.  They should not contain conclusions."  *U.S. Info. Sys., Inc. v. Int'l Brotherhood of Elec. Workers Loc. Union No. 3*, No. 00-CV-4763, 2006 WL 2136249, at *3 (S.D.N.Y. Aug. 1, 2006) (emphasis in original) (quoting *Rodriguez v. Schneider*, No. 95-CV-4083, 1999 WL 459813, at *1 n.3 (S.D.N.Y. June 29, 1999)); *see also Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) ("Many of [the] [p]laintiff's purported denials—and a number of his admissions— improperly interject arguments and/or immaterial facts in response to facts asserted by [the]

Court recounts the facts "in the light most favorable to" Plaintiff, the non-movant, and draws all reasonable inferences in her favor. *Torcivia v. Suffolk County*, 17 F.4th 342, 354 (2d Cir. 2021) (citing *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014) (per curiam)).  The material facts described below are in dispute only to the extent indicated.

### 2.  Parties and Other Relevant Actors

Maranatha is a non-profit organization that has historically offered community and residential services to assist individuals with developmental disabilities, such as cerebral palsy, epilepsy, and autism.  (Def's 56.1 ¶ 1; Pl's 56.1 ¶ 1; *see also id.* ¶ 73; Resp. to Add'l Mat. Facts ¶ 73.)[4]  When the events at issue took place, Maranatha was licensed by the New York State

---

[d]efendants, often speaking past [the] [d]efendants' asserted facts without specifically controverting those same facts.").  The Court will thus also deem a fact admitted where Plaintiff's denial relies upon legal argument or conclusions.

A denial founded on the fact that the party's statement of fact paraphrases the underlying evidence does not create a dispute of fact where the denial fails to "suggest [the party] erroneously, inaccurately or . . . misleadingly characterized" the evidence.  *Droplets, Inc. v. E*TRADE Fin. Corp.*, No. 12-CV-2326, 2015 WL 1062670, at *4 (S.D.N.Y. Mar. 9, 2015).  Thus, where Plaintiff has objected to the paraphrasing of underlying evidence or testimony but fails to cite facts that indicate that characterization is misleading, the Court will deem the fact admitted.

With respect to paragraphs relying on pleadings in this Action, "an unverified complaint is not evidence that can be relied upon at summary judgment."  *Caro Cap., LLC v. Koch*, 653 F. Supp. 3d 108, 132 (S.D.N.Y. 2023); *see also Bentivegna v. People's United Bank*, No. 14-CV-599, 2017 WL 3394601, at *13 (E.D.N.Y. Aug. 7, 2017) ("[A]n unverified complaint is not admissible evidence.").  The Court is therefore free to disregard any such unsupported assertions.

Finally, it bears noting that "the net result of [Plaintiff's] counsel's deficiencies has been to impose on the Court and its limited resources the burden of parsing the entirety of the voluminous record in the instant case to ensure that [her] client's claims receive thorough and just consideration."  *Risco v. McHugh*, 868 F. Supp. 2d 75, 88 n.2 (S.D.N.Y. 2012).  "It simply will not do for counsel to say that genuine issues of material fact exist and then rely on the Court to go find them."  *Id.*

[4] To the extent Maranatha cites to public websites in its Rule 56.1 Statement, the Court notes that district courts "have regularly taken judicial notice of publicly available . . . writings on websites when the parties do not dispute the authenticity of the documents."  *McKenna v. Nassau County*, No. 23-CV-4286, 2023 WL 8455670, at *6 (E.D.N.Y. Dec. 6, 2023) (collecting cases).

4

Office for People with Developmental Disabilities ("OPWDD") to provide such services.  (Def's 56.1 ¶ 2; Pl's 56.1 ¶ 2.).  Maranatha received its funding primarily from the government, including through Medicaid.  (Pl's 56.1 ¶ 73; Resp. to Add'l Mat. Facts ¶ 73.)  As is relevant here, Maranatha's residential services have included supervised housing for individuals with severe disabilities, which services are known as Individualized Residential Alternatives ("IRAs").  (Def's 56.1 ¶ 2; Pl's 56.1 ¶ 2.)[5]

Maranatha originally hired Plaintiff as a case manager in or around April 2000 and, thereafter, she was promoted several times to the position of "case manager supervisor, residential coordinator/director, residential director[,] and deputy director."  (Def's 56.1 ¶ 3; Pl's 56.1 ¶ 3.)[6]  In approximately September 2015, Plaintiff was promoted to the position of Chief Operating Officer ("COO").  (Pl's 56.1 ¶ 73; Resp. to Add'l Mat. Facts ¶ 73.)  As COO, Plaintiff, among other things, oversaw Maranatha's IRAs, Day Hab Programs, Family Care Programs, and also oversaw quality assurance.  (Pl's 56.1 ¶ 74; Resp. to Add'l Mat. Facts ¶ 74.)  It is also undisputed that filling vacancies at Maranatha's IRAs—which will be described in greater detail below—was an important aspect of Plaintiff's role as COO.  (Def's 56.1 ¶ 11; Pl's 56.1 ¶ 11; *see also* Declaration of Tina Sciocchetti, Esq. ("Sciocchetti Decl.") Ex. A ("Pl. Dep. Tr.") at 75:18–76:3 (Plaintiff's deposition testimony explaining that "vacancy management was

---

[5] Maranatha also offered Day Habilitation ("Day Hab") programs at its IRAs and at community-based locations; after school programs; and People Embracing People or "Family Care" programs.  (Def's 56.1 ¶ 2; Pl's 56.1 ¶ 2.)

[6] The Parties do not dispute that Plaintiff was also temporarily "demoted" at some point prior to 2008.  (Def's 56.1 ¶ 4; Pl's 56.1 ¶ 4.)  Specifically, Coley lowered her salary by $5,000.00 after Maranatha received an OPWDD citation based on another staff member stealing a resident's money at a Maranatha residence that Plaintiff supervised.  (*See* Declaration of Stephanie Munford ("Pl. Decl.") ¶ 3 (Dkt. No. 166); *see also* Pl's 56.1 ¶ 4.)

and is a priority") (Dkt. No. 155-1); *id.* at 97:4–8 (Plaintiff's deposition testimony agreeing that "vacancy management was one of [her] most important job duties").)[7]

During the relevant time period, Coley served as Maranatha's Chief Executive Officer ("CEO"). (Def's 56.1 ¶ 6; Pl's 56.1 ¶ 6.) In her role as COO, Plaintiff reported to Coley and served as his "second-in-command." (Pl's 56.1 ¶ 73; Resp. to Add'l Mat. Facts ¶ 73.) During her deposition, Maranatha's Director of Human Resources, Holly Theohary ("Theohary"), testified that Maranatha employees feared Coley in the sense that they were "[a]fraid to get fired" and that, as a result, they "tend[ed] to just go along with" Coley's proposals in light of that fear. (Declaration of Heidi Wendel, Esq. ("Wendel Decl.") Ex. M at 29:16–30:5 (Dkt. No. 163-13); *see also* Wendel Decl. Ex. J at 39:4–41:7 (deposition testimony of Maranatha employee Zane Every, stating that he sent an anonymous letter to Maranatha's Board of Directors ("Board") raising certain complaints and explaining that he did so anonymously because, had he signed the letter, he "would have been terminated") (Dkt. No. 163-10); *id.* at 41:2–7 ("For all the years I [worked for Maranatha, Coley made] veiled threat[s]. You do something to me, you're gonna be gone.").)[8]

### 3. Vacancies at Maranatha IRAs

Each of Maranatha's IRAs only had a certain number of beds available for residents at any given time. (Def's 56.1 ¶ 9; Pl's 56.1 ¶ 9.) Whenever a bed became available at an IRA such that there was a "vacancy," it was important for every effort to be made to fill those vacancies. (*See* Def's 56.1 ¶¶ 9–10; Pl's 56.1 ¶¶ 9–10.) This was so at least in part because,

---

[7] Citations to deposition transcripts cite the internal page and line numbers therein.

[8] Theohary further testified that, although only Plaintiff made specific complaints to her regarding Coley's behavior, "the general consensus" among employees based on their complaints was that Coley "was, for a lack of a better term, a jerk, not a nice person." (Wendel Decl. Ex. M at 27:24–28:8.)

although a vacancy in any of Maranatha's programs yielded a reduction in revenue, a vacancy in an IRA was particularly problematic because Maranatha did not receive revenue or reimbursement for vacant beds *and* continued incurring the costs associated with maintaining those beds.  (Def's 56.1 ¶ 10; Pl's 56.1 ¶ 10; *see also* Pl. Dep. Tr. 96:20–97:3 (Plaintiff's deposition testimony agreeing that "vacancies hurt Maranatha's bottom line").)

As is relevant here, when a bed became available at one of Maranatha's IRAs because a resident had to be hospitalized or go to a different type of a facility, such as a nursing home, OPWDD policies required that Maranatha keep that bed open for that resident unless the bed was formally released pursuant to an OPWDD finding that the resident could not return to the IRA. (Pl's 56.1 ¶ 106; Resp. to Add'l Mat. Facts ¶ 106.)[9]  The Parties agree that OPWDD's due process policies "resulted in large losses of revenue for agencies such as Maranatha," given that "the agency had to pay the costs of maintaining the bed in the home for the absent resident but, based on OPWDD policies, could not bill for those costs."  (Pl's 56.1 ¶ 107; Resp. to Add'l Mat. Facts ¶ 107; *see also* Wendel Decl. Ex. DDD at 2–3 (revenue and expenditure statement reflecting that Maranatha lost $181,567.00 in Medicaid revenue as a result of vacancies in its IRA program during the period spanning July 1, 2013 through June 30, 2014) (Dkt. No. 163-56); Sciocchetti Decl. Ex. R at 2 (chart reflecting: (1) that in the fiscal years beginning in 2015, 2016, 2017, and 2018, Maranatha lost $125,789.00, $258,298.00, $319,503.00, and $109,833.00 due to residential vacancies, respectively; and (2) that Maranatha typically had one to two, and occasionally three, vacancies at a time during that same period) (Dkt. No. 155-18).)

---

[9] These policies are referred to as OPWDD's "due process" policies.  (Pl's 56.1 ¶ 106; Resp. to Add'l Mat. Facts ¶ 106.)

To manage vacancies at Maranatha IRAs, Plaintiff—in her capacity as COO—interfaced with OPWDD regarding those vacancies and, for its part, OPWDD would provide Maranatha packets of information about individuals referred for placement in its IRAs.  (Def's 56.1 ¶ 12; Pl's 56.1 ¶ 12.)  Internally, Plaintiff managed the teams responsible for both reviewing the referral packets from OPWDD and determining whether each potential residents would be a "good fit" for Maranatha's IRAs, (Def's 56.1 ¶ 13; Pl's 56.1 ¶ 13), taking into account factors such as the characteristics of the potential residents, the relevant IRA, and the current residents of that IRA, (Pl's 56.1 ¶ 110; Resp. to Add'l Mat. Facts ¶ 110).

### 4.  Events in and Around 2018

#### a.  Plaintiff's Complaints

Sometime in early 2018, Plaintiff became concerned about the amounts reflected in certain invoices submitted to Maranatha by Coley's brother, Allen ("Allen").  (Def's 56.1 ¶ 65; Pl's 56.1 ¶ 65.)  As Plaintiff explained at her deposition, although she did not "raise issues" with Coley regarding Allen, she did refuse—multiple times—to sign off on a $18,000 invoice, which purported to be for Allen's services.  (Wendel Decl. Ex. I ("Pl. Dep. Tr. II") 131:10–133:15 (Dkt. No. 163-9).)[10]  By March 2018, Coley learned that Plaintiff had sought to address this invoice issue with Allen.  (Def's 56.1 ¶ 66; Pl's 56.1 ¶ 66.)  Then, on March 21, 2018, Coley emailed Plaintiff, copying Maranatha's Board Chairman Clifford Manie ("Manie"), and indicated that he was writing "[i]n response to [Plaintiff] giving [him] a heads up that [Plaintiff] filed a complaint with the ombudsman of the agency who happen[ed] to be [his] brother

---

[10] Plaintiff testified that Maranatha employees had been informed that Allen did "ombudsman work" for the organization.  (Pl. Dep. Tr. II at 128:4–9.)
   For clarity, the Court will refer to the excerpt of Plaintiff's deposition transcript attached to the Sciocchetti Declaration as Pl. Dep. Tr., and will refer to the excerpt of Plaintiff's deposition transcript attached to the Wendel Declaration as Pl. Dep. Tr. II.

[Allen]."  (Wendel Decl. Ex. FF at 1 (Dkt. No. 163-32).)  He further stated, among other things, that he would "be more than happy to listen to whatever complaints [Plaintiff had] about how [he did his] job, [or] how it [affected her] and the rest of the agency," and that she should feel free to address her concerns with Manie or Maranatha's Chief Financial Officer, Hai-Ping Fu ("Fu"). (*Id.*)[11]

During the same time period, Plaintiff informed Coley that his son, Michael Coley ("Michael"), was working for Maranatha in an inappropriate manner.  (Def's 56.1 ¶ 59; Pl's 56.1 ¶ 59.)  Specifically, Plaintiff testified that, in sum and substance, she told Coley that "[he could not] have [his] son working [at Maranatha] as [both] an employee and as a contractor, and [that Michael] supposedly work[ed] ten hours a day on his job as an employee but [was] showing up for his contract job cleaning the headquarters office during the ten-hour shift when he[ was] supposed to be working as an employee [at Maranatha's] upstate IRAs."  (Pl. Dep. Tr. 149:20–24 (as amended in the errata sheet at ECF p. 53).)

### b.  Financial Concerns at Maranatha

In 2017 and 2018, some of Maranatha's employees were concerned about the organization's financial health.  (*See* Def's 56.1 ¶ 17; Pl's 56.1 ¶ 17.)  Although Plaintiff asserts that Maranatha's financial problems "were caused by its own malfeasance" and were "due to the misappropriation of Medicaid funds that was perpetrated by . . . Coley, with the approval of the board of directors of Maranatha[,]" (Pl's 56.1 ¶ 17), Maranatha points to evidence suggesting

---

[11] Plaintiff asserts that this email "was intended to be threatening to [Plaintiff] and she understood it to be threatening."  (Pl's 56.1 ¶ 66.)

The Court notes that Plaintiff responded to Coley that same day, with Manie still copied, saying:  "I understand the conflict of interest with Allan [sic].  I did not file a complaint but shared my thoughts where I felt safe knowing that he would truly have both our best interest. Your taking the time to speak to me this morning allowed me to share my thoughts and concerns. I sincerely appreciate your reaching out to me and hearing me.  I am fine.  Moving forward I will come to you directly."  (Schiocchetti Decl. Ex. UU at 2 (Dkt. No. 155-47).)

that its financial issues stemmed, at least in part, from vacancies at its residential programs, (*see, e.g.*, Sciocchetti Decl. Ex. F ("Fu Dep. Tr.") 87:3–15 (Fu's deposition testimony agreeing that that there was a "major vacancy problem" in March 2017) (Dkt. No. 155-6); *see also id.* at 87:16–18 (Fu's testimony agreeing that there was a "serious vacancy problem" as early as 2014); Sciocchetti Decl. Ex. R at 2 (chart reflecting lost revenue due to residential vacancies in the fiscal years beginning in 2015, 2016, 2017, and 2018)).  Notably, in connection with Maranatha's financial issues, Coley said to Plaintiff in a March 13, 2018 email that "[e]ven if we were able to fill all vacancies, it wouldn't be enough."  (Wendel Decl. Ex. HH at 1 (Dkt. No. 163-34).)

By the spring of 2018, Maranatha laid off multiple employees, (*see* Fu Dep. Tr. at 64:6–19 (Fu's testimony that Maranatha laid off around five employees by late spring of 2018)), and was considering reducing employee pay by 5%, (*see* Sciocchetti Decl. Ex. U at 2 (April 17, 2018 email from Coley to Fu, in which Coley states, "I want to send an email out to people next week with the paychecks regarding the proposed 5% cut") (Dkt. No. 155-21)).[12]  Indeed, in a June 28, 2018 email from Coley to Plaintiff, Coley explained that "our cash shortage is much more acute than initially realized.  We have to turn things around in [sixty] days at the most or we will be swallowed up by a larger corporation."  (Sciocchetti Decl. Ex. AA at 2 (Dkt. No. 155-27).)

### c.  Discussions Regarding Plaintiff's Employment Status

On June 8, 2018, Coley expressed concerns to his brother Allen via email about Plaintiff's performance as Maranatha's COO.  (*See* Sciocchetti Decl. Ex. P at 2–3 (Dkt. No. 155-16).)  Specifically, he stated that he had "finally reached a point where [he] ha[d] no confidence in her ability to manage the programs without having [him] involved daily. . . . [He had] no

---

[12] Again, Plaintiff argues that these layoff and payroll issues were attributable to Coley's "misappropriate of Maranatha's funds for his own purposes."  (Pl's 56.1 ¶ 18.)

recourse but to consider letting her go." (*Id.* at 3.)[13]  On June 19, 2018, however, he told

Maranatha's outside counsel, Jack Kiley ("Kiley"), via email that he "still ha[d] not made a final

decision about [Plaintiff], except to remove her from her current job."  (Sciocchetti Decl. Ex. BB

at 2 (Dkt. No. 155-28); *see* Def's 56.1 ¶ 31; Pl's 56.1 ¶ 31; *see also* Sciocchetti Decl. Ex. DD at

2 (June 26, 2018 email from Coley in which he stated that "[he] believe[d] it[ was] best to

remove [Plaintiff] from her current position")  (Dkt. No. 155-30).)

At around the same time, Coley reached out to a former Maranatha employee—Debra

Williams ("Williams")—for assistance in filling vacancies at Maranatha's residences.  (Def's

56.1 ¶ 27; *see also* Pl's 56.1 ¶ 27 (failing to dispute this paragraph in Maranatha's Rule 56.1

Statement).)  Williams thereafter joined Maranatha as a consultant on July 16, 2018.  (Def's 56.1

¶ 28; Pl's 56.1 ¶ 28; *see also* Sciocchetti Decl. Ex. DD at 2 (June 26, 2018 email from Coley to

Williams explaining that "[he] would like to keep [her] on as a consultant for the next [three to

twelve] months").)  During the course of the hiring process, Williams underwent a pre-

employment background check, the results of which were sent to a number of Maranatha

employees, including Plaintiff.  (Def's 56.1 ¶¶ 29–30; Pl's 56.1 ¶¶ 29–30.)

By July 9, 2018, Coley asked Kiley to work with Theohary to finalize a plan to terminate

Plaintiff's employment with Maranatha.  (Def's 56.1 ¶¶ 32–33; Pl's 56.1 ¶¶ 32–33; *see also*

Sciocchetti Decl. Ex. H at 19:3–9 (Kiley's deposition testimony during which he read into the

record his July 11, 2018 notes, which stated that Coley had "told [Theohary that] he was

terminating [Plaintiff] last week and again today") (Dkt. No. 155-8).)  That same day, Plaintiff

---

[13] Plaintiff contends that, to the extent Coley was considering terminating her
employment, he was doing so in retaliation for her "refusing to sign an $18,000 invoice from his
brother Allen . . . and for objecting to paying . . . Coley's son Michael . . . for a low-show job, as
well as objecting more generally to . . . Coley's misappropriation of Maranatha's operating funds
for his own and his family's use and for his private for-profit enterprises."  (Pl's 56.1 ¶ 26.)

was in a car accident and subsequently went out on medical leave, so Kiley recommended

waiting to terminate Plaintiff until after she returned from leave.  (Def's 56.1 ¶¶ 7, 34; Pl's 56.1

¶¶ 7, 34.)  Coley, however, did not want to wait because he had already told Maranatha

employees that Williams would be rejoining the organization.  (Def's 56.1 ¶ 35; Pl's 56.1

¶ 35.)[14]  Accordingly, Kiley sent Coley and Theohary a draft separation agreement for Plaintiff

on the afternoon of Friday, July 20, 2018.  (Def's 56.1 ¶ 36; Pl's 56.1 ¶ 36.)  In the draft

separation agreement, Maranatha purported to offer certain "severance benefits in exchange for

[Plaintiff's] release of [any] claims" against Maranatha.  (*See* Sciocchetti Decl. Ex. JJ at 3 (Dkt.

No. 155-36).)

### d.  The Board Letter

Plaintiff wrote a letter dated Monday, July 23, 2018 to the Maranatha's Board Chairman,

Manie.  (*See* Sciocchetti Decl. Ex. NN ("Board Letter") (Dkt. No. 155-40); *see also* Wendel

Decl. Ex. II (copy of the Board Letter accompanying Plaintiff's opposition papers) (Dkt. No.

163-35).)  Among other allegations, Plaintiff stated in her letter that "there is mounting evidence

of suspected improper and inappropriate and likely fraudulent expenditures of Medicaid money."

(Board Letter 3.)  Plaintiff went on to state:

> The diversion of the organization's money to Mr. Coley and his personal family is
> inexcusable under any circumstances and for any organization.  But it is
> exceptionally inexcusable here, where Medicaid funds should go to further the
> mission of the organization and its delivery of client services.  An example of the
> improper diversion of funds include[s], but I do not believe [is] limited to, a contract
> with Mr. Coley's brother, All[e]n Coley in the role of Ombudsman to pay him
> $3,000.00 a month.  In December 2017 during a meeting of staff, All[e]n Coley
> placed a manila envelope in front of me, instructing me "not to open it there, to
> open it in my office,"  In the envelope was an invoice for $18,000.00 for additional

---

[14] Although she does not dispute that Coley told Kiley he did not want to wait to
terminate her, Plaintiff avers that Coley was lying to Kiley in his conversations with him.  (*See*
Pl's 56.1 ¶ 35.)

services rendered.  I did not sign or approve the invoice, as I knew as fact that at least some of those services had never been rendered.

(*Id.*)

Plaintiff sent a copy of the Board Letter, by regular mail only, to each member of the Board, as well as Theohary.  (Def's 56.1 ¶ 45; Pl's 56.1 ¶ 45.)  Those individuals received the letter by no later than July 30, 2018.  (Def's 56.1 ¶ 46; Pl's 56.1 ¶ 46.)[15]

### e.  Subsequent Investigations

In response to the Board Letter, Maranatha authorized two separate investigations into the allegations therein—one led by Maranatha's Chief Compliance Officer, Rosalind Medley, and the other conducted by the outside firm Marks Paneth.  (Def's 56.1 ¶ 48; Pl's 56.1 ¶ 48.)  Although those investigations did not substantiate Plaintiff's allegations, (Def's 56.1 ¶¶ 51–53), Plaintiff asserts that, in light of Maranatha's and Coley's eventual settlements with the United

---

[15] Maranatha points to certain evidence to suggest that Plaintiff was fully aware that she was facing termination when she sent the Board Letter.  For example, on July 16, 2018—Williams's first day back at Maranatha—a co-worker sent Plaintiff an instant message, saying "FYI, we were called into a meeting with Debra today- what a[n] uncomfortable situation !!" (Sciocchetti Decl. Ex. EE at 2 (Dkt. No. 155-31).)  Additionally, on July 20, 2018—the same day Coley and Theohary received the draft separation agreement from Kiley—Theohary emailed Plaintiff in order to set up an in-person between Plaintiff and Coley.  (Def's 56.1 ¶ 38; Pl's 56.1 ¶ 38.)  Later that same day, Theohary sent Plaintiff the following instant message:

> I just want you to know that you mean a great deal to me and I cherish the years we had together.  I consider you my friend and I truly respect you and all you have accomplished in your life.  I will always look back on our time together with much love and appreciation.  I am grateful more than I can explain and thankful our paths crossed in this life!  [heart emojis]  I thank you for all the laughs and understanding. Now is your time to truly shine!

(Sciocchetti Decl. Ex. KK at 4 (Dkt. No. 155-37).)  Plaintiff responded the next day, stating "thank you for your kind words.  Working with you had been a pleasure and honor."  (*Id.* at 2.)

Plaintiff denies that she understood that she was facing termination based on any of these communications.  (*See* Pl's 56.1 ¶¶ 38–43.)

States and the State of New York in this Action, that was because they were "sham" investigations. (Pl's 56.1 ¶¶ 51–53).

Given the concern that terminating Plaintiff after she sent the Board Letter could be perceived as retaliation, Maranatha waited for the investigations to finish before taking any action in connection with her employment status. (Sciocchetti Decl. Ex. E at 59:11–22 (Deposition testimony of Maranatha Board Secretary Steve Scott explaining that "we had the investigation[s] before we took any action" based on the possibility that Coley wanted to terminate Plaintiff as a form of retaliation) (Dkt. No. 155-5).)

### f. Plaintiff's Termination

By letter dated September 25, 2018, Maranatha, through Coley, terminated Plaintiff effective October 1, 2018. (Def's 56.1 ¶ 57; Pl's 56.1 ¶ 57; *see also* Sciocchetti Decl. Ex. L (letter notifying Plaintiff of her termination) (Dkt. No. 155-12).) In the letter, Coley explained:

> [E]ffective October 1, 2018, your employment [at Maranatha] is being terminated and your job eliminated due to a combination of your poor job performance and the company's financial constraints. As you know from our discussions prior to your going out on a medical leave of absence on July 9, 2018, there were several issues with your job performance. Most seriously, you were unable, as part of your job duties, to fill vacancies at our facilities, which has resulted in your being responsible for a loss in revenue of $400,000. On July 16, 2018, I announced to staff that I had I [sic] hired an independent consultant to work on getting those vacancies filled and that you would no longer be in charge. With our financial position being so precarious, we cannot afford to have you continue in your position.

(Sciocchetti Decl. Ex. L at 2.)

### B. Procedural History

The procedural history of this Action is rather long and complicated. The Court therefore recounts it only to the extent necessary to resolve the instant Motion. Plaintiff filed her initial Complaint in this Action under seal on September 28, 2018. (*See* Dkt. No. 1; *see also* Relator's Compl. (Dkt. No. 24) (unsealed on November 16, 2021).) As noted above, the United States and

14

the State of New York thereafter intervened in this Action, (*see* U.S. Compl.; NYS Compl.), and have since settled their claims against Maranatha and Coley, (Stip. and Order of Settlement and Dismissal (memorializing settlement between the State of New York and Coley) (Dkt. No. 18); Stip. and Order of Settlement and Dismissal (memorializing settlement between the United States and Coley) (Dkt. No. 19); Stip. and Order of Settlement and Dismissal (memorializing settlement between the United States and Maranatha) (Dkt. No. 88); Stip. and Order of Settlement and Dismissal (memorializing settlement between the State of New York and Maranatha) (Dkt. No. 90)).

Following discovery, Maranatha sought leave to move for summary judgment on Plaintiff's federal retaliation claim on January 24, 2023. (*See* Letter from Tina Sciocchetti, Esq. to Court (Jan. 24, 2023) (Dkt. No. 136).)[16]  Plaintiff filed her response on January 31, 2023. (*See* Letter from Heidi Wendel, Esq. to Court (Jan. 31, 2023) (Dkt. No. 138).)  On February 21, 2023, the Court held a pre-motion conference, during which it adopted a briefing schedule. (*See* Dkt. (minute entry for Feb. 21, 2023).)

With the Court's permission, (*see* Order (Dkt. No. 147)), Plaintiff filed the FAC on March 15, 2023, (*see* FAC).  The FAC added an additional retaliation claim arising under the NYFCA, N.Y. State Fin. Law § 191.  (*Id.* ¶¶ 52–57.)

Pursuant to the Court-adopted briefing schedule, Maranatha filed its Motion and accompanying papers on March 28, 2023.  (*See* Not. of Mot.; Mem. of Law in Supp. of Mot. for Summ. J. ("Def's Mem.") (Dkt. No. 152); Def's 56.1; Sciocchetti Decl. (Dkt. No. 155).)[17]  After

---

[16] At that time, the operative Complaint did not contain a NYFCA retaliation claim.  (*See generally* Relator's Compl.)

[17] When it filed its Motion, Maranatha requested the Court's permission to redact personally identifiable information from certain of its exhibits.  (*See* Letter from Christopher J.

a request for an extension that the Court granted, (*see* Dkt. Nos. 157–58),[18] Plaintiff filed her opposition and accompanying papers on May 23, 2023l, (*see* Mem. of Law in Opp'n to Mot. for Summ. J. ("Pl's Opp'n") (Dkt. No. 161); Wendel Decl. (Dkt. No. 163); Pl's 56.1.)[19]  On June 9, 2023, Maranatha filed its reply and accompanying papers.  (*See* Reply Mem. of Law in Supp. of Mot. for Summ. J. ("Def's Reply") (Dkt. No. 173); Reply Aff. of Tina Sciocchetti ("Sciocchetti Reply Aff.") (Dkt No. 174); Resp. to Add'l Mat. Facts.)

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) (same); *Truitt v. Salisbury Bank & Tr. Co.*, 52 F.4th 80, 85 (2d Cir. 2022) (same); *Cambridge Funding Source LLC v. Emco Oilfield Servs. LLC*, No. 22-CV-10741, 2023 WL 7405862, at *4 (S.D.N.Y. Nov. 9, 2023) (same).  "In deciding whether to award summary judgment, the court must construe the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor."  *Torcivia*, 17 F.4th at 354; *see also Horror Inc. v. Miller*, 15 F.4th 232, 240 (2d Cir. 2021) (same).  "The movant 'bears the initial burden of showing that there is no

---

Stevens to Court (Mar. 28, 2023) (Dkt. No. 154).)  The Court granted that request.  (*See* Order (Dkt. No. 156).)

[18] The Court granted a corresponding extension for Maranatha to file its reply papers as well.  (*See* Order (Dkt. No. 158).)

[19] Like Maranatha, Plaintiff submitted a letter in advance of filing her Opposition, in which she requested permission to redact personally identifiable information for certain of her exhibits.  (*See* Letter from Heidi Wendel, Esq. to Court (May 19, 2023) (Dkt. No. 159).  The Court granted that request as well.  (*See* Order (Dkt. No. 160).)

genuine dispute as to a material fact.'" *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d

Cir. 2022) (quoting *Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018)); *see also LaFontant v. Mid-*

*Hudson Forensic Psychiatric Ctr.*, No. 18-CV-23, 2023 WL 6610764, at *7 (S.D.N.Y. Oct. 10,

2023) (same); *Red Pocket, Inc. v. Interactive Commc'ns Int'l, Inc.*, No. 17-CV-5670, 2020 WL

838279, at *4 (S.D.N.Y. Feb. 20, 2020) (same).

      "However, when the burden of proof at trial would fall on the non[-]moving party, it

ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an

essential element of the non[-]movant's claim," in which case "the non[-]moving party must

come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order

to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d

114, 123 (2d Cir. 2013) (alteration adopted) (quotation marks and citation omitted); *see also U.S.*

*Bank Nat'l Ass'n as Tr. for Reg. Holders of J.P. Morgan Chase Com. Mortg. Sec. Corp.,*

*Multifamily Mortg. Pass-Through Certificates, Series 2017-SB42 v. 160 Palisades Realty*

*Partners LLC*, No. 20-CV-8089, 2022 WL 743928, at *3 (S.D.N.Y. Mar. 10, 2022) (same).

Further, "[t]o survive a [summary judgment] motion . . . , [a non-movant] need[s] to create more

than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward

with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692

F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 586–87 (1986)); *see also Jennifer Fung-Schwartz, D.P.M, LLC v.*

*Cerner Corp.*, No. 17-CV-233, 2023 WL 6646385, at *3 (S.D.N.Y. Oct. 12, 2023) (same), "and

cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co.*

*v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Kollias*

*v. Univ. of Rochester*, No. 18-CV-6566, 2023 WL 5608868, at *4 (W.D.N.Y. Aug. 30, 2023)

("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading." (quoting *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009))).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Seward v. Antonini*, No. 20-CV-9251, 2023 WL 6387180, at *12 (S.D.N.Y. Sept. 29, 2023) (quoting *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014)). "At this stage, 'the role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried.'" *U.S. Sec. & Exch. Comm'n v. Amah*, No. 21-CV-6694, 2023 WL 6386956, at *8 (S.D.N.Y. Sept. 28, 2023) (alteration adopted) (quoting *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011)). Therefore, "a court's goal should be 'to isolate and dispose of factually unsupported claims.'" *Sullivan v. Nat'l Express LLC*, No. 21-CV-5789, 2023 WL 6279255, at *8 (S.D.N.Y. Sept. 26, 2023) (quoting *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004)).

When ruling on a motion for summary judgment, a district court should "consider only evidence that would be admissible at trial." *Latimer v. Annucci*, No. 21-CV-1275, 2023 WL 6795495, at *3 (S.D.N.Y. Oct. 13, 2023) (citing *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998)). "[W]here a party relies on affidavits or deposition testimony to establish facts, the statements must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." *Mozzochi v. Town of Glastonbury*, No. 21-CV-1159, 2023 WL 3303947, at *3 (D. Conn. May 8, 2023) (quoting *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir.

2012) (quoting Fed. R. Civ. P. 56(c)(4))); *see also LaFlam v. Am. Sugar Refining, Inc.*, No. 21-CV-6710, 2024 WL 149766, at *4 (S.D.N.Y. Jan. 12, 2024) ("Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge . . . ." (internal citation omitted)); *Baity*, 51 F. Supp. 3d at 419 (disregarding "statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." (internal citation omitted)).

"As a general rule, 'district courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage.'" *Parker v. Fantasia*, 425 F. Supp. 3d 171, 183 (S.D.N.Y. 2019) (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (noting that at the summary judgment stage, the court is not to "weigh the evidence and determine the truth of the matter"); *Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 622 (2d Cir. 1999) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." (quotation marks omitted)).  Where the evidence presents "a question of 'he said, she said'" the court "cannot . . . take a side at the summary judgment stage." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010); *see also Kassel v. City of Middletown*, 272 F. Supp. 3d 516, 535 (S.D.N.Y. 2017) (noting that "it is not the role of the [c]ourt at summary judgment to resolve [a] factual clash"); *Bale v. Nastasi*, 982 F. Supp. 2d 250, 258–59 (S.D.N.Y. 2013) (stating that "[w]here each side . . . tells a story that is at least plausible and would allow a jury to find in its favor, it is for the jury to make the credibility determinations and apportion liability, and not for the court.").  And, even if the non-movant's evidence is "thin, [a non-movant's] own sworn statement is adequate to counter summary judgment." *Scott v.*

19

*Coughlin*, 344 F.3d 282, 290–91 (2d Cir. 2003) (holding that "[t]he credibility of [the plaintiff's]

statements and the weight of contradictory evidence may only be evaluated by a finder of fact").

    B.  Analysis

    As noted above, Plaintiff has raised retaliation claims pursuant to the FCA, 31 U.S.C.

§ 3730(h), and the NYFCA, N.Y. State Fin. Law § 191.  (*See* FAC ¶¶ 46–57.)  Under 31 U.S.C.

§ 3730(h):

> Any employee, contractor, or agent shall be entitled to all relief necessary to make
> that employee, contractor, or agent whole, if that employee, contractor, or agent is
> discharged, demoted, suspended, threatened, harassed, or in any other manner
> discriminated against in the terms and conditions of employment because of lawful
> acts done by the employee, contractor, agent or associated others in furtherance of
> an action under this section or other efforts to stop [one] or more violations of [the
> FCA].

31 U.S.C. § 3730(h)(1); *see also* N.Y. State Fin. Law § 191(1) (providing substantially the same

under the NYFCA).  Because "[t]he NYFCA follows the federal [FCA]," New York courts "look

toward federal law when interpreting the New York act."  *State ex rel. Seiden v. Utica First Ins.*,

943 N.Y.S.2d 36, 39 (App. Div. 2012); *see also United States ex rel. Lee v. N. Adult Daily*

*Health Care Ctr.*, 205 F. Supp. 3d 276, 286 (E.D.N.Y. 2016) (same).  "Courts [therefore]

generally treat these two provisions together, as their elements overlap significantly."  *United*

*States ex rel. Raffington v. Bon Secours Health Sys., Inc.*, 405 F. Supp. 3d 549, 555 (S.D.N.Y.

2019) (citation omitted); *see also Mirza v. Garnet Health*, No. 20-CV-556, 2022 WL 826410, at

*7–13 (S.D.N.Y. Mar. 17, 2022) (analyzing FCA and NYFCA retaliation claims when

addressing a summary judgment motion).  Thus, the Court will analyze Plaintiff's FCA- and

NYFCA-based retaliation claims in tandem.

    To establish her retaliation claims, Plaintiff must "show that (1) [s]he engaged in activity

protected under the statute[s], (2) the employer was aware of such activity, and (3) the employer

took adverse action against [her] *because* [s]he engaged in the protected activity." *Knight v.*

*Standard Chartered Bank*, 531 F. Supp. 3d 755, 768 (S.D.N.Y. 2021) (emphasis added) (quoting

*United States ex rel. Chorches for Bankr. Est. of Fabula v. Am. Med. Response, Inc.*, 865 F.3d

71, 95 (2d Cir. 2017)); *see also Liss v. Heritage Health & Hous., Inc.*, No. 19-CV-4797, 2023

WL 2267366, at *5 (S.D.N.Y. Feb. 28, 2023) (same).[20]

In support of its Motion, Maranatha first argues that Plaintiff has failed to adduce

sufficient evidence to establish the elements of a retaliation claim under the FCA and the

NYFCA.  (*See* Def's Mem. 15–26.)  Next, Maranatha contends that, even if Plaintiff could

establish the elements of a retaliation claim, Maranatha has shown that it terminated Plaintiff for

legitimate, non-retaliatory reasons.  (*See id.* at 26–27.)  Finally, Maranatha asserts that Plaintiff

has failed to demonstrate that Maranatha's proffered non-retaliatory reasons for her termination

were merely pretexts for retaliation.  (*See id.* at 27–28.)

As explained below, the Court concludes that, under the applicable legal framework and

in light of the record before it, Maranatha is not entitled to summary judgment on Plaintiff's

retaliation claims.

### 1.  Protected Activity

The Court first turns to whether Plaintiff engaged in protected activity under the FCA and

NYFCA.  "Protected conduct under the [FCA and NYFCA] is interpreted broadly."  *Liss*, 2023

WL 2267366, at *6 (quoting *New York ex rel. Khurana v. Spherion Corp.*, 511 F. Supp. 3d 455,

472 (S.D.N.Y. 2021)).  Such conduct includes: "(1) lawful acts done by the employee,

---

[20] Although the Second Circuit did not expressly adopt this framework in *Chorches*, *see* 865 F.3d at 95, this Court notes that the Second Circuit continues implicitly to endorse its application in its non-precedential summary orders, *see, e.g.*, *Pilat v. Amedisys, Inc.*, No. 23-566, 2024 WL 177990, at *1 (2d Cir. Jan. 17, 2024) (summary order); *Dhaliwal v. Salix Pharms., Ltd.*, 752 F. App'x 99, 100 (2d Cir. 2019) (summary order); *Plotzker v. Kips Bay Anesthesia, P.C.*, 745 F. App'x 436, 437 (2d Cir. 2018) (summary order).

contractor, agent, or associated others in furtherance of an action under the FCA, and (2) other

efforts to stop one or more violations of the FCA." *Khurana*, 511 F. Supp. 3d at 472; *see also*

*Plotzker v. Kips Bay Endoscopy Ctr., LLC*, No. 12-CV-9255, 2017 WL 4326061, at *5

(S.D.N.Y. Sept. 8, 2017) ("Within the second category of protected conduct, a retaliation claim

can be stated so long as the employee was engaged in efforts to stop an FCA violation, even if

the employee's actions were not necessarily in furtherance of an FCA claim." (quotation marks

omitted)), *aff'd sub nom. Plotzker*, 745 F. App'x 436.

Notwithstanding the broad nature of "protected conduct," "the employee's purpose must

not be detached from the [statutes] in order for the employee to receive . . . whistle blower

protections." *Khurana*, 511 F. Supp. 3d at 472–73 (quoting *Garcia v. Aspira of N.Y., Inc.*, No.

07-CV-5600, 2011 WL 1458155, at *4 (S.D.N.Y. Apr. 13, 2011)).  In other words, the conduct

must "be directed at exposing a fraud upon the government." *Fisch v. New Heights Acad.*

*Charter Sch.*, No. 12-CV-2033, 2012 WL 4049959, at *5 (S.D.N.Y. Sept. 13, 2012) (quotation

marks omitted); *see also Koshy v. Regeneron Pharms., Inc.*, No. 17-CV-7781, 2019 WL

6895563, at *6 (S.D.N.Y. Dec. 18, 2019) ("[E]ven under the broadest reading of . . . 'in

furtherance of an [FCA] action,' an employee's activities that are not related to exposing or

deterring fraud, are not whistle blowing as envisioned in the paradigm qui tam FCA action."

(second alteration in original) (citation omitted)); *Grant v. Abbott House*, No. 14-CV-8703, 2016

WL 796864, at *7 (S.D.N.Y. Feb. 22, 2016) ("Simply put, '[t]he plaintiff must demonstrate that

her investigation, inquiries, and/or testimony were directed at exposing a fraud upon the

government.'" (alteration in original) (quoting *Moor-Jankowski v. Bd. of Trustees of N.Y. Univ.*,

No. 96-CV-5997, 1998 WL 474084, at *10 (S.D.N.Y. Aug. 10, 1998))).  "[M]erely grumbling to

the employer about job dissatisfaction or regulatory violations does not . . . constitute protected

activity." *Lawrence v. Int'l Bus. Mach. Corp.*, No. 12-CV-8433, 2017 WL 3278917, at *6 (S.D.N.Y. Aug. 1, 2017) ("Although correcting regulatory problems may be a laudable goal, those problems are not actionable under the FCA in the absence of actual fraudulent conduct, and so reporting them falls outside the purview of the FCA's anti-retaliation provision.").

As an initial matter, Maranatha does not dispute that Plaintiff engaged in protected activity when she sent the Board Letter, (*see* Def's Mem. 15 (Maranatha's concession that sending the Board letter amounted to protected activity)), nor could it, given that the Board Letter expressly states that "there is mounting evidence of suspected improper and inappropriate and likely fraudulent expenditures of Medicaid money," (Board Letter 3). *See also Fisch*, 2012 WL 4049959, at *5 (explaining that employee investigations "directed at exposing a fraud upon the government" can constitute protected activity (citation omitted)). Thus, the question before the Court is whether Plaintiff's remaining proffered actions—that, in the spring of 2018, she expressed concerns about (1) an $18,000 invoice allegedly for Allen's services, and (2) the fact that Coley's son Michael worked for Maranatha as both an employee and a contractor—also constitute protected activity. (*See* Pl's Opp'n 10–12, 19–21.) Based on the evidence in the record, the Court concludes that Plaintiff has failed to adduce sufficient evidence to support her assertion that these complaints amounted to protected activity under the FCA or the NYFCA.

Starting with the complaint regarding Allen's invoice, Plaintiff testified that she merely refused to sign a $18,000 invoice on several occasions. (Pl. Dep. Tr. II at 131:10–133:15; *see also* Schiocchetti Decl. Ex. UU at 2 (email in which Plaintiff states that she did not "file a complaint" regarding this issue, but, instead, simply "shared [her] thoughts").) In addition, there is evidence reflecting that Coley emailed Plaintiff regarding this invoice issue, copying Board Chairman Manie, and informed her that, among other things, she could reach out to Manie or

23

CFO Fu to address her concerns.  (*See* Wendel Decl. Ex. FF at 1.)  And with respect to Coley's

son, Michael, Plaintiff testified only that she told Coley that "[he could not] have [his] son

working [at Maranatha] as [both] an employee and as a contractor, and [that Michael]

supposedly work[ed] ten hours a day on his job as an employee but [was] showing up for his

contract job cleaning the headquarters office during the ten-hour shift when he[ was] supposed to

be working as an employee [at Maranatha's] upstate IRAs."  (Pl. Dep. Tr. 149:20–24 (as

amended in the errata sheet at ECF p. 53).)

At most, even when drawing all reasonable inferences in Plaintiff's favor, these

complaints demonstrate that Plaintiff believed that Allen was seeking too high a payment from

Maranatha for his services; that Michael was working in an inappropriate manner by serving as

both an employee and a contractor; and, more generally, that there was a nepotism issue within

Maranatha stemming from Coley.  However, Plaintiff "points [the Court] to nothing in the record

indicating that she expressed concerns to anyone at [Maranatha] that these practices were illegal

or may [have led] to the submission of false claims[,]" until she submitted the Board Letter.

*Dhaliwal*, 752 F. App'x at 101 (affirming in relevant part the district court's grant of summary

judgment in an FCA retaliation case).  That is, based on the record before the Court, no

reasonable fact finder could conclude that these complaints were, as of the spring of 2018, aimed

at "exposing fraud upon the government."  *Fisch*, 2012 WL 4049959, at *5; *see also Koshy*,

2019 WL 6895563, at *6 (observing that simply "grumbling to the employer about . . . regulatory

violations does not constitute protected activity" (internal quotation marks omitted)); *Ortiz v.

Todres & Co., LLP*, No. 15-CV-1506, 2019 WL 1207856, at *4 (S.D.N.Y. Mar. 14, 2019)

(noting that "an employee's activities that are not related to exposing or deterring fraud, are not

whistleblowing" (quotation marks omitted)); *Lawrence*, 2017 WL 3278917, at *6 (explaining

that "[m]ere investigation of an employer's non-compliance with federal regulations is not enough to constitute protected activity" (alteration in original) (quotation marks omitted)).  Even crediting Plaintiff's newly-raised assertion that these complaints were "more generally about trying to dial back . . . Coley's syphoning off of Medicaid funds from Maranatha," (Pl. Decl. ¶ 20), that statement, without more, supports at most a fleeting "metaphysical doubt" concerning whether Plaintiff engaged in protected conduct, *see Matsushita Elec. Indus. Co.*, 475 U.S. at 586.

In sum, for the remainder of its analysis, the Court will consider only Plaintiff's act of sending the Board Letter as protected activity covered by the FCA and NYFCA.

### 2.  Defendant's Awareness

Next, the Court considers briefly whether Maranatha was aware of Plaintiff's only remaining protected activity—her act of sending the Board Letter.  A plaintiff bringing retaliation claims under the FCA and NYFCA must demonstrate that her employer was aware that she engaged in protected conduct.  *See Ortiz*, 2019 WL 1207856, at *4; *see also Swanson v. Battery Park City Auth.*, No. 15-CV-6938, 2016 WL 3198309, at *5 (S.D.N.Y. June 8, 2016) (stating, in an NYFCA case, "[a]fter all, in order for a plaintiff to show that she was retaliated against for activity protected . . . , the defendant must know that she was engaged in protected activity").

Here, there is no question that Maranatha, through its Board, was aware that Plaintiff sent the Board Letter alleging a number of improprieties on the part of Coley by no later than July 30, 2018.  (*See* Def's 56.1 ¶ 46; Pl's 56.1 ¶ 46.)  Thus, summary judgment on the basis of this element of the FCA and NYFCA retaliation claim analysis is inappropriate.[21]

---

[21] Although Maranatha further argues that "[p]laintiffs alleging that performance of their normal job responsibilities constitutes protected activity must overcome the presumption that they are merely acting in accordance with their employment obligations," (Def's Mem. 22 (quoting *Koshy*, 2019 WL 6895563, at *7)), it is unclear that such a standard remains viable, *see,*

### 3. Adverse Action and Causation

The Court next turns to assessing whether Maranatha "took adverse action against [Plaintiff] *because* [s]he engaged in the protected activity." *Knight*, 531 F. Supp. 3d at 768 (emphasis added) (citation omitted). To start, the Court notes that there is no dispute that Plaintiff suffered an adverse action, in that Maranatha terminated her employment effective October 1, 2018. *See* 31 U.S.C. § 3730(h)(1) (for purposes of the FCA, an adverse action occurs when, inter alia, an employee "is discharged"); N.Y. State Fin. Law § 191(1) (same for purposes of the NYFCA); *Forkell v. Lott Assisted Living Corp.*, No. 10-CV-5765, 2012 WL 1901199, at *11 n.8, (S.D.N.Y. May 21, 2012) ("[T]ermination clearly constitutes adverse action.").

With regard to causation, the "question is whether [Plaintiff] has demonstrated that her termination occurred '*because of*' her disclosure of her concerns regarding" Coley's asserted misuse of Maranatha's funds. *Liss*, 2023 WL 2267366, at *9 (emphasis added) (citing *Khurana*, 511 F. Supp. 3d at 479). "Although the Second Circuit has not yet addressed [the question of what causation standard applies to FCA retaliation claims], several [courts] in this District have held that the but-for standard is the appropriate one." *Khurana*, 511 F. Supp. 3d at 479 (collecting cases and explaining that "[i]n so finding, [those courts] have relied on the Supreme Court's instruction—in the Title VII context—that the term '"because of" . . . typically imports, at a minimum, the traditional standard of but-for causation'" (citing, inter alia, *E.E.O.C. v.*

_____

*e.g.*, *Swanson*, 2016 WL 3198309, at *5 (explaining that "some courts have observed that it is doubtful that those heightened [standards for notice] survive [the 2009 amendments to the FCA and analogous revisions to the NYFCA] as the decisions propounding the heightened standard were concerned with ensuring that the employer was on notice of an employee's intentions of *bringing or assisting in an FCA action*, while the 2009 amendments broadened the scope of the FCA's whistleblower provision to protect against retaliation in cases where the employee was engaged *in efforts to stop an FCA violation*, even if the employee's actions were not necessarily in furtherance of an FCA claim." (alterations and emphases in original) (quotation marks omitted)).

*Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 772–73 (2015))); *see also Liss*, 2023 WL 2267366, at *9 (same).

In addition, when assessing the causation element of an FCA retaliation claim, district courts in the Second Circuit apply the burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *See Liss*, 2023 WL 2267366, at *9; *see also Forkell*, 2012 WL 1901199, at *10 (same); *cf. Liburd v. Bronx Lebanon Hosp. Ctr.*, 372 F. App'x 137, 139 (2d Cir. 2010) (summary order) (applying the *McDonnell Douglas* framework and affirming the district court's grant of summary judgment on the plaintiff's FCA retaliation claim). "This framework involves three phases: (1) the employee bears the initial burden of producing evidence sufficient to support a prima facie case of retaliation; (2) the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions; and (3) the burden shifts back to the employee to demonstrate that the employer's stated reason is a pretext for retaliation." *Liss*, 2023 WL 2267366, at *9 (ultimately citing *McDonnell Douglas Corp.*, 411 U.S. at 802–04). The Court will address each of these phases in turn.

### a.  Prima Facie Case

"A prima facie case requires only a 'de minimis' showing of '(1) participation in a protected activity; (2) the defendant's knowledge of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.'" *Liss*, 2023 WL 2267366, at *9 (quoting *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 844 (2d Cr. 2013)). As explained above in Sections II.B.1–3, Plaintiff has proffered sufficient evidence to allow a reasonable fact finder to conclude that she engaged in a protected activity that Maranatha knew about, and that she was terminated thereafter. Accordingly, the

Court will now consider whether Plaintiff can establish a causal connection between her decision to send the Board Letter and her termination.

Here, Plaintiff offers evidence that she mailed the Board Letter on or around July 23, 2018, (*see* Board Letter; Def's 56.1 ¶ 45; Pl's 56.1 ¶ 45); that the Board Letter was received by individuals associated with Maranatha by July 30, 2018, (Def's 56.1 ¶ 46; Pl's 56.1 ¶ 46); and that she was thereafter terminated effective October 1, 2018 by letter dated September 25, 2018. (Def's 56.1 ¶ 57; Pl's 56.1 ¶ 57; *see also* Sciocchetti Decl. Ex. L at 2.)  Given that "[t]emporal proximity can support an inference of retaliation for purposes of establishing a prima facie case of retaliation," the Court concludes that the approximately two-month period between Plaintiff's act of sending the Board Letter and her ultimate termination supports the inference that she suffered that adverse employment action *because* she had engaged on protected activity. *Beckles-Canton v. Lutheran Soc. Servs. of N.Y., Inc.*, No. 20-CV-4379, 2021 WL 3077460, at *8 (S.D.N.Y. July 20, 2021) (italics and citation omitted) (explaining, in the motion-to-dismiss context, that even "gaps of seven and eight months may support a sufficient temporal connection if accompanied by other indicia of retaliatory motive" (citation omitted)); *cf. Mirza*, 2022 WL 826410, at *13 (noting, in the summary-judgment context, that "the passage of *more than* two months between the protected activity and the adverse employment action does not allow for an inference of causation" (emphasis added)).

In support of its Motion, Maranatha relies heavily on the fact that Coley had been considering terminating Plaintiff before July 23, 2018, and therefore argues that it would have been "impossible, as a simple matter of timing, for the Board Letter to have motivated Maranatha's decision to terminate Plaintiff."  (Def's Mem. 16–18.)  To be sure, there is evidence in the record that Coley was working with Kiley and Theohary in the months—and even days—

before Plaintiff sent the Board Letter.  *See supra* Section I.A.4.c.  However, under the unique circumstances of this case, a reasonable fact finder could conclude that, notwithstanding the fact that she may have been facing the possibility of termination before she sent the Board Letter, Plaintiff's decision to send the Board Letter was the but-for cause of her termination.  (*See* Pl's 56.1 ¶¶ 126–30 (discussing record evidence, which suggests—even if weakly—that it was the Board Letter that, in fact, resulted in Plaintiff's termination).)  Moreover, Maranatha relies heavily upon Coley's word and thus implicitly and inappropriately urges the Court to find his word to be more credible than that of Plaintiff.  (*See, e.g.*, Def's Mem. 10 n.4.)  *See also Parker*, 425 F. Supp. 3d at 183 ("[D]istrict courts may not . . . assess the credibility of witnesses at the summary judgment stage." (citation omitted)).

Maranatha also asserts that the "very existence" of the internal and external investigations following the organization's receipt of the Board letter, *see supra* Section I.A.4.e, "undermines the existence of any causal connection between the Board Letter and Plaintiff's termination," (Def's Mem. 18).  As Maranatha points out, the court in *Forkell* observed that "the notion of a causal connection" in that case was "undermin[ed]" by "the fact that [the] defendants commissioned not one, but two investigations" relating to the plaintiff's allegations of fraud. 2012 WL 1901199, at *11.  However, nothing in that case stands for the proposition that the existence of investigations stemming from a plaintiff's protected activity under the FCA necessarily *severs*—as a matter of law—a causal connection that is otherwise supported by the evidence.

In short, in light of the conflicting evidence that the Parties have proffered on the issue of causation, Maranatha is not entitled to summary judgment in its favor on that issue.

### b.  Legitimate, Non-Discriminatory Rationale

Under the applicable framework, the Court next considers whether Maranatha has met its burden of articulating "a legitimate, non-discriminatory reason for its actions" for its decision to terminate Plaintiff.  *Liss*, 2023 WL 2267366, at *9.

As noted, in his letter notifying Plaintiff of her termination, Coley explained that her "employment [at Maranatha was] being terminated and [her] job eliminated due to a combination of [her] poor job performance and the company's financial constraints."  (Sciocchetti Decl. Ex. L at 2; *see also* Def's Mem. 26 (raising these same reasons for Plaintiff's termination in connection with Maranatha's Motion).)  Aside from baldly asserting that these grounds for her termination were "pretextual" (which, the Court notes, is beside the point at this phase of the analysis), (Pl's Opp'n 6), Plaintiff offers no arguments against them, (*see generally id.*).  Thus, "Plaintiff waived this argument by failing to respond to [Maranatha's] arguments in her opposition."  *See Hess v. Mid Hudson Valley Staffco LLC*, No. 16-CV-1166, 2018 WL 4168976, at *18 (S.D.N.Y. Aug. 30, 2018) (citing *Simon v. City of New York*, No. 14-CV-8391, 2015 WL 4092389, at *2 (S.D.N.Y. July 6, 2015)).  And, in any event, the Court does not doubt that, at minimum, a reasonable fact finder could conclude—based on the evidence in the record—that Plaintiff's asserted "poor job performance" was a legitimate, non-retaliatory basis for her termination, given that (1) IRA vacancies existed, (2) Plaintiff was responsible for filling those vacancies, and (3) those vacancies hurt Maranatha's bottom line.  (*See* Def's 56.1 ¶ 14; Pl's 56.1 ¶ 14.)  *See also Plotzker*, 2017 WL 4326061, at *7 (concluding that there was sufficient evidence of the plaintiff's "overall poor performance" to establish that such poor performance was a legitimate, non-retaliatory reason for his termination).

c. Pretext

Finally, the Court considers whether Plaintiff has met her corresponding burden of proffering sufficient evidence for a reasonable fact finder to conclude that Maranatha's "stated reason[s for her termination were] a pretext for retaliation." *Liss*, 2023 WL 2267366, at *9. At this phase of the analysis, Plaintiff has the burden of producing "sufficient evidence to support a rational finding that the legitimate, non-[retaliatory] reasons proffered by [Maranatha] were false, and that more likely than not [retaliation] was the real reason for the employment action." *Forkell*, 2012 WL 1901199, at *12 (first and third alterations in original) (citation omitted).

The Court concludes that Plaintiff has met her burden of putting forth evidence suggesting that Maranatha's proffered reasons for her termination were pretextual. Although Maranatha urges that Plaintiff was terminated for her own failure to fill vacancies at the organization's IRAs, (*see* Def's Mem. 27–28), Plaintiff points to evidence that, in fact, OPWDD policies prevented her—and thereby Maranatha—from timely finding new residents for the IRAs, (*see* Pl's 56.1 ¶¶ 106–07, 109, 115; Resp. to Add'l Mat. Facts ¶¶ 106–07, 109, 115.) Crucially, Plaintiff cites certain Maranatha corporate documents corroborating the fact that OPWDD policies hindered the organization's ability to fill vacancies. (*See, e.g.*, Wendel Decl. Ex. X at 3 (minutes from a May 3, 2018 Maranatha Board meeting, indicating that Coley gave a report to the effect that "[the g]overnment is challenging the existence of smaller companies" because of a policy under which "only the government [could] submit replacements for individuals who have left a facility") (Dkt. No. 163-24); Wendel Decl. Ex. W at 3 (Maranatha Executive Report stating that "[i]t seems as if the government is rapidly moving forward to squeeze the smaller companies out of business" in light of a policy pursuant to "which . . . only the government can submit replacements for individuals who have left a facility") (Dkt. No. 163-23).) And with respect to Maranatha's second asserted basis for letting Plaintiff go—its

31

"financial constraints"—Plaintiff's termination letter stated that her position as COO was being "eliminated." (Sciocchetti Decl. Ex. L at 2.) However, as Plaintiff argues, Maranatha at that same time—and belying somewhat its asserted financial concerns—hired and paid Williams to "work on getting . . . vacancies filled." (*Id.*; *see also* Def's 56.1 ¶ 28; Pl's 56.1 ¶ 28.)

Moreover, there is additional evidence in the record suggesting that Maranatha's proffered bases for terminating Plaintiff were pretextual. (*See* Wendel Decl. Ex. HH at 1 (March 13, 2018 email from Coley in which he states: "Even if we were able to fill all vacancies, it wouldn't be enough" to address Maranatha's financial situation); *see also* Wendel Decl. Ex. PP at 1 (September 25, 2018 email in which Theohary indicates that "poor job performance" had been removed from a draft of Plaintiff's termination letter because Coley "strongly wanted that taken out") (Dkt. No. 163-42); Wendel Decl. Ex. NN at 1 (September 20, 2018 email from Coley stating that "[i]t was [Plaintiff's] frequent use of [Allen] that made me feel that perhaps[] she was unable to do the job and needed to be terminated") (Dkt. No. 163-40); *cf.* Sciocchetti Decl. Ex. R at 2 (chart reflecting, among other things, that Maranatha typically had no more than one to two, and occasionally three, vacancies at a time in the fiscal years beginning in 2015, 2016, 2017, and 2018).)

In its reply, Maranatha does nothing more than raise factual arguments to counter Plaintiff's evidence, which it suggests compel certain inferences in its favor. (Def's Reply 11–13.) However, insofar as Maranatha raises "a question of 'he said, she said,' . . . the [C]ourt cannot . . . take a side at the summary judgment stage." *Fincher*, 604 F.3d at 726; *see also Kassel*, 272 F. Supp. 3d at 535 ("[I]t is not the role of the Court at summary judgment to resolve [a] factual clash."); *Santiago v. City of Yonkers*, No. 13-CV-1077, 2015 WL 6914799, at *2 (S.D.N.Y. Oct. 30, 2015) ("Where each party tells a story that is at least plausible and would

allow a jury to find in its favor, it is for the jury to make the credibility determinations and apportion liability, and not for the court.").

*          *          *

In short, even if Plaintiff's evidence with respect to her retaliation claims is "thin," "[t]he credibility of [Plaintiff's and, especially, Coley's] statements and the weight of contradictory evidence may only be evaluated by a finder of fact." *Scott*, 344 F.3d at 290–91.  Thus, summary judgment on those claims is inappropriate here.

### III.  Conclusion

For the reasons stated above, Maranatha's Motion is denied.  The Court will hold a telephonic status conference in this case on April 2, 2024 at 10:30 a.m.  The Clerk of Court is respectfully directed to terminate the pending Motion.  (*See* Dkt. No. 151.)

SO ORDERED.

Dated:   March 5, 2024
         White Plains, New York

_____
          KENNETH M. KARAS
       United States District Judge